Isaac LERNER, Eli Lerner, Ballyward Investment Company, Ltd., Jaime Sohacheski, Gaston Limited, Hotel Investors, Inc., Perky Limited, Abraham Rappaport, Esther Rappaport, Moshe Cohn, Establissement Somer, Josef Kohn, Chancery Enterprises, Ltd., Rosdev Developments, Inc., Michael Rosenberg, Bruce Bayroff, Joshua Goldstein, Land Tech Manalapan LLC, Theodore Brodie, Meyer Rosenbaum, Mr Associates LLC, Ilana Blumkin, as Trustee, Emdee Tours, Inc., Alexander Hasenfeld, Inc., Profit Sharing Retirement Plan, Hasenfeld Stein, Inc., Pension Trust, Aeg Agency, Inc., Aaron Garfinkel, Rivka Stein, Aaron Y. Rubinson, Steven B. Rothchild, P.C., Money Purchase Plan, Pinchos Rubinson, Akiva Leiman, Estate of Boruch Rubinson, Chaim and Rachel Lefkowitz, Naftali and Sarah Lipshutz, Mendel and Feigy Lipschutz, Reisel Bergstein, Michael Konig, Esther Wertenteil, Aaron Wertenteil, Teena Rubinfeld, Mark Wertenteil, Morris and Sarah Friedman, the Regal Trade, S.A., Vavel Corp., Chadwick Funding Co., L.P.,

Allen Sausen and Leonard Sausen, d/b/a Atassco, Keren Hachesed of Monsey, Inc., Geneva Properties, L.L.C., Mt. Pleasant Partners, Herschel Kulefsky, Albert David Pearls & Gems, Inc., Defined Benefit Pension Plan, Chai Properties Corp., Arthur Kurtz, Crestfield Associates, Inc., Weinreb Management, and Howard Mermelstein, Plaintiffs–Appellants,

v.

FLEET BANK, N.A., Sterling National Bank and Trust Company of New York, and Republic National Bank of New York, Defendants–Appellees.

Docket No. 05–5106 CV.

United States Court of Appeals, Second Circuit.

Argued: April 26, 2006.

Decided: Aug. 8, 2006.

Edward S. Rudofsky, Zane and Rudofsky (James B. Zane, Eric S. Horowitz, of

counsel), New York, NY, for Plaintiffs–Appellants.

Thomas J. Moloney, Cleary Gottlieb Steen & Hamilton LLP (David Rush, of counsel), New York, NY, for Defendant–Appellee Fleet Bank, N.A.

Allen C. Wasserman, Lord, Bissell & Brook LLP (James DeRose III, of counsel), New York, NY, for Defendant–Appellee Sterling National Bank.

Celia Goldwag Barenholtz, Kronish Lieb Weiner & Hellman LLP (Chaya F. Weinberg–Brodt, of counsel), New York, NY, for Defendant–Appellee Republic National Bank of New York.

Before: WALKER, Chief Judge, KEARSE and SACK, Circuit Judges.

SACK, Circuit Judge.

The plaintiffs are investors who were defrauded by lawyer David Schick in the early 1990s as part of his multi-million-dollar Ponzi scheme. Many of Schick's victims have tried with varying degrees of success to recover some of their lost investments from Schick's estate in bankruptcy, *see, e.g., In re Venture Mortgage Fund, L.P.,* 282 F.3d 185 (2d Cir.2002), and from various banks that allegedly either abetted or failed to detect Schick's activities, *see, e.g., Schmidt v. Fleet Bank,* 16 F.Supp.2d 340 (S.D.N.Y.1998).

This is the second time we have considered these investors' claims against these defendants. The plaintiffs allege that the defendant banks assisted Schick by failing to report his overdrafts on attorney fiduciary accounts to the state bar for disciplinary action and by evading their reporting duties by misleadingly marking some checks drawn against accounts with insufficient funds as "Refer to Maker." The district court (Frederic Block, *Judge*) previously dismissed the plaintiffs' attempt to bring these allegations as a claim under

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and declined to exercise supplemental jurisdiction over their state-law claims. *See Lerner v. Fleet Bank, N.A.,* 146 F.Supp.2d 224 (E.D.N.Y.2001). We affirmed the court's dismissal of the RICO claim because the plaintiffs had failed to plead sufficient facts to show proximate causation under the RICO statute. *See Lerner v. Fleet Bank, N.A. (Lerner I ),* 318 F.3d 113 (2d Cir.), *cert. denied,* 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003). But because we concluded that there was an adequate basis for diversity jurisdiction and supplemental jurisdiction over non-diverse parties, we remanded with instructions for the court to decide the plaintiffs' state-law claims.

On remand, the district court again granted the defendants' Rule 12(b)(6) motion to dismiss, concluding that because all of the plaintiffs' state-law claims include an allegation on the element of proximate causation, the dismissal of the plaintiffs' RICO claim for lack of proximate cause required that the state-law claims be dismissed on the same grounds. We disagree. A plaintiff must make a different showing of proximate cause—one that is often more difficult to make—when bringing suit under the RICO statute than when bringing a common-law cause of action. Our finding of a failure of the allegations of proximate cause under RICO does not, therefore, necessarily imply a similar finding for the plaintiffs' state-law claims.

We conclude that each plaintiff who actually had funds on deposit with the defendants Fleet Bank, N.A. ("Fleet"), Sterling National Bank and Trust Company of New York ("Sterling"), or Republic National Bank of New York ("Republic") has stated a claim against that bank or those banks for negligence and for aiding and abetting breach of fiduciary duty under New York

law. We therefore vacate the judgment of the district court insofar as it dismissed those claims. We affirm the district court's dismissal of each of the plaintiffs' claims against any such defendant in which the plaintiff did not have funds on deposit. We also affirm (with one exception) the dismissal of the plaintiffs' claims for fraud and commercial bad faith.

## BACKGROUND

We outlined the substance of David Schick's fraudulent scheme in *Lerner I:*

Schick convinced investors that he had devised a no-risk scheme for generating a high return on their investments. Schick would bid on distressed mortgage pools at auctions by the Resolution Trust Company, the Federal Deposit Insurance Company ("FDIC"), and other banking institutions. Upon being awarded the bid, he would immediately try to re-sell the mortgage pool to another buyer for a quick profit. The acceptance of his bid was subject to a ninety-day due diligence period, so Schick assured his investors that if he was unable to find a buyer within the ninety-day time period, he would be able to rescind his original purchase without incurring any penalty. Schick's plan was apparently foolproof—except, he explained to the investors, in order to make this scheme work, Schick had to prove to the FDIC that he could complete the purchase. He would therefore be required to deposit substantial sums of cash as evidence of his good faith. This is where Schick's potential investors came in.

To convince wary investors that their money would be secure, Schick agreed to deposit the entrusted funds in escrow accounts covered by restrictive provisions. *Lerner v. Fleet Bank, N.A.,* 146

F.Supp.2d 224, 225–27 (E.D.N.Y.2001). He also entered into escrow agreements with the investors that stated: "Escrow Agent are attorneys [sic] admitted to practice in the State of New York and shall act as fiduciary in accordance with the relevant provisions of the Judiciary Law and all other ethical or legal standards for attorneys admitted to practice in the State of New York and expressly agrees that the only person who shall be entitled to, or have any right or interest in the Escrow Deposit shall be the Depositor." Armed with these guarantees, and relying on the fact that Schick was an attorney in good standing with the New York bar, the investors turned their money over to Schick for deposit in the defendant banks. Ultimately, however, these escrow agreements provided little protection against Schick's unscrupulous conduct. Before the investors discovered his fraud, Schick had raided the accounts repeatedly and managed to steal approximately $82 million.

*Id.* at 117–18 (brackets in original).

The plaintiffs based their RICO claims primarily on the banks' failure to report Schick's overdrafts on his attorney fiduciary accounts to the Lawyers' Fund for Client Protection of the State of New York, as required by New York law. New York's Disciplinary Code requires that "[a] lawyer who is in possession of funds belonging to another person incident to the lawyer's practice of law, shall maintain such funds in a banking institution within the State of New York which agrees to provide dishonored check reports" to the Lawyers' Fund. *See* N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.46(b)(1). Each of the defendants had entered into one or more agreements with the Lawyers' Fund, in which they agreed to report all checks drawn by attorneys on "special," "trust," "escrow," or "IOLA"[1] accounts that were

---

1. IOLA stands for "Interest On Lawyers Account." Ac-

dishonored for insufficient funds. *See id.* at § 1300.1.

The Lawyers' Fund uses these reports of checks dishonored for insufficient funds, known colloquially as "bounced" checks, to initiate disciplinary proceedings against lawyers who mishandle client funds. A check on a client account that is dishonored for insufficient funds is often evidence that a lawyer has improperly commingled client funds, in violation of his or her fiduciary duties. *See generally* ABA Model Rules for Trust Account Overdraft Notification, R.2, *available at* http://www.abanet.org/cpr/clientpro/orule2.html (last visited June 24, 2006).

In support of their RICO claim, the plaintiffs alleged primarily that the banks engaged in a conspiracy to corrupt the Lawyers' Fund. After we affirmed dismissal of that claim and remanded to the district court for its consideration of the plaintiffs' state-law claims, the court instructed the plaintiffs to submit an amended complaint that pared down their many state-law claims. The plaintiffs' second amended complaint replaced the portion of the original complaint addressing the

state-law causes of action. But the first 147 pages of the earlier complaint, which described the factual background of the allegations, remained substantially unchanged. *See* Oral Arg. Tr. of April 26, 2006 at 44 ("[T]his was not an exercise in realleging the facts of the case. And if you compare the first amended complaint to the second amended complaint, you will see that the hundreds and hundreds of allegations of facts[,] . . . that they're all the same. We didn't redo that part of the complaint. All we did was cut down the state-law claims . . . .").

Our recitation of the remainder of the facts focuses on those allegations that are most relevant to the plaintiffs' remaining state-law claims. In stating the facts for purposes of considering this appeal, we take all of the plaintiffs' allegations to be true "and draw all reasonable inferences in the plaintiffs' favor." *Pena v. DePrisco,* 432 F.3d 98, 102 (2d Cir.2005) (internal quotation marks, citation, and alteration omitted). "The narrative that we are about to repeat therefore paints various defendants in 'decidedly unflattering col-

---

An IOLA is a creation of New York State statute, and is defined as "an unsegregated interest-bearing deposit account . . . for the deposit by an attorney of qualified funds." N.Y. Jud. Law § 497(1) (McKinney Supp. 1991). In turn, "qualified funds" are statutorily defined as,

> monies received by an attorney in a fiduciary capacity from a client or beneficial owner and which, in the judgment of the attorney, are too small in amount or are reasonably expected to be held for too short time to generate sufficient interest to justify the expense of administering a segregated account for the benefit of the client or beneficial owner.

*Id.* at § 497(2). The interest earned by an IOLA is remitted directly to the state IOLA fund, and is used by New York to pay for legal assistance for the poor, and to improve the administration of justice generally. *See id.* at § 497(6)(c)(i).

*Peoples Westchester Sav. Bank v. FDIC,* 961 F.2d 327, 329 (2d Cir.1992).

Some states refer to the accounts as IOLTA, for "Interest On Lawyers Trust Account."

> Every State in the Nation and the District of Columbia have followed Florida's lead and adopted an IOLTA program, either through their legislatures or their highest courts. The result is that, whereas before 1980 the banks retained the value of the use of the money deposited in non-interest-bearing client trust accounts, today, because of the adoption of IOLTA programs, that value is transferred to charitable entities providing legal services for the poor. The aggregate value of those contributions in 2001 apparently exceeded $200 million.

*Brown v. Legal Found.,* 538 U.S. 216, 221–22, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) (footnotes omitted).

ors,' which may or may not be borne out by the facts." *Id.* at 102–03 (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir.2001)).

According to the second amended complaint, although Schick told his clients that the accounts were "escrow deposits," he never executed escrow agreements with the banks. Escrow accounts are classified as "special deposits," which must be segregated from the bank's other assets. Instead, Schick deposited their funds in attorney trust accounts and IOLA accounts, which are classified as "general deposits" that become part of the bank's general assets. *See Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir. 1992). Although Schick told the investors that the funds could not be withdrawn without their permission, Schick had full access to the accounts and was free to withdraw from them without the clients' knowledge or consent.[2]

According to the second amended complaint, Schick had a close business relationship with Leonard Patnoi, then the branch manager of Fleet's Broad Street branch. Patnoi served as Schick's accounts officer at Fleet from 1985 to 1992. Around 1992 or 1993, Patnoi was terminated as branch manager at Fleet's Broad Street Branch, then rehired as branch manager at Fleet's Hewlett Branch and

subsequently promoted to Vice President of the bank. When Patnoi moved to the Hewlett Branch, Schick either transferred his existing accounts to the Hewlett Branch or opened new accounts there. Patnoi again served as the Fleet account officer of Schick's accounts. Between 1993 and 1996, Schick-controlled deposits at the Hewlett Branch totaled approximately $1 billion. Schick was the single largest source of deposits at the Hewlett Branch, averaging $60–80 million per month. The plaintiffs allege that in light of the enormous amount of business the bank was doing with Schick, Fleet was willing to bend the rules for him.

The plaintiffs further allege that beginning in 1993, Schick began writing checks on attorney fiduciary accounts at Fleet that had insufficient funds to cover them. Fleet would honor these checks despite the insufficient funds by extending automatic loans to cover the overdrafts. The bank allowed these overdrafts even though it knew that Schick was under a duty as an attorney-fiduciary not to commingle his clients' funds. By allowing the overdrafts to continue, the plaintiffs allege, "Fleet intentionally and knowingly permitted Schick to violate the ... implied and written agreements[] governing account documents and restrictions, knowing and/or recklessly indifferent to the fact that such

---

**2.** Fleet and Republic argue that Schick's relevant accounts at their banks were not properly designated as attorney fiduciary accounts. Instead, the accounts were labeled simply "Attorney at Law," and were, therefore, exempt from the Lawyers' Fund reporting requirements. But according to the plaintiffs' complaint, whether or not the accounts were titled as IOLA accounts, the banks had actual knowledge that they were intended to be trust accounts for client funds. According to the complaint,

[t]he Banks knew this, *inter alia,* because of (a) written "escrow" agreements provided to the Banks, (b) references to "escrow"

agreements in wire transfer requests and/or confirmations, and (c) numerous occasions on which there were insufficient funds in order to honor checks drawn by Schick on such accounts and Schick expressly remarked to bank officers, in words or substance, that outstanding checks drawn on such accounts "had" to be covered because the funds involved were the property of others.

Second Am. Compl. ¶ 114, Drawing all inferences in plaintiffs' favor on a Rule 12(b)(6) motion to dismiss, we assume that these accounts were trust accounts as alleged.

conduct was in violation of plaintiffs' rights as intended beneficiaries under said contracts and would cause each of them injury." Second Am. Compl. ¶ 158.

Sometime in 1993, Fleet's district manager with responsibility for the Hewlett Branch confronted Patnoi about the overdrafts. Patnoi then told Schick that Fleet could no longer cover his overdrafts and that the bank would begin dishonoring Schick's checks drawn against insufficient funds. Schick allegedly responded that if Fleet bounced his checks, the bank would be required by law to report Schick to the Lawyers' Fund and that if Schick were disbarred, Schick could no longer bring business to the bank. Fleet would then bear the loss associated with all of Schick's then-current overdrafts. Patnoi agreed not to report the bounced checks to the Lawyers' Fund and to respond to any inquiries about them by vouching that there were double-digit million-dollar balances in the accounts. Patnoi also promised Schick that the other employees at the Hewlett Branch would tell the "same 'story.'" Id. at ¶ 165. The plaintiffs allege that this plan was approved by officers at the highest levels of the bank. The plaintiffs do not, however, allege any specific instance of a bank officer actually telling such a "story."

At some point in 1994 or 1995, Schick told Patnoi that he was having trouble explaining the bounced checks to investors. Patnoi met with his superiors, and they devised a plan to return the checks to the payees marked as "Refer to Maker," without indicating that they were being returned for insufficient funds. The plaintiffs assert that Fleet adopted this strategy with the intent of misleading those payees. One plaintiff, Crestfield Associates, received a "Refer to Maker" check on January 8, 1996—approximately six weeks

after it made its one and only investment with Schick.

A similar pattern of behavior emerged involving Schick and Sterling. Around March 1994, according to the plaintiffs, Schick began bouncing checks drawn on his attorney-fiduciary accounts there. The plaintiffs allege that Sterling, like Fleet, "with at least reckless disregard of the consequences to the plaintiffs and all other victims of Schick's scheme, intentionally failed and wrongfully omitted to report those bounced checks to the Lawyers' Fund solely so as to protect Sterling's valuable business relationship with Schick." Id. at ¶ 200.

In 1995, Sterling began auditing Schick's accounts. Sterling Executive Vice President Leonard Rudolph told Schick that the bank was worried about the overdrafts and that it was required to report dishonored checks to the Lawyers' Fund. According to the plaintiffs, Schick told Rudolph " 'how Fleet is handling the problem'" and suggested that Sterling return problem checks to the payees marked "Refer to Maker." Id. at ¶ 203. At about this time, Rudolph also advised Schick to use an account entitled "attorney-at-law" without any more descriptive words such as "special," "escrow," or "trust" in the title in order to avoid the Lawyers' Fund reporting requirements. Schick had subsequent meetings with other Sterling executives in which they discussed Schick's business in depth and agreed to mark bounced checks as "Refer to Maker" and not to report the insufficient funds to the Lawyers' Fund.

The second amended complaint further asserts that after learning that a check issued on a Sterling account had been returned marked "Refer to Maker," a representative of plaintiff/payee The Regal Trade, S.A., telephoned Rudolph and asked him why the check had been returned. Rudolph told the representative

that "there were 'back office problems,' which had nothing to do with Schick, but as a result of which the check was returned and he should call Schick and arrange to get replacement checks." *Id.* at ¶ 209. The Regal representative asked Rudolph directly whether there were sufficient funds in Schick's account to cover the check. Rudolph confirmed that there were.

In late 1995, Schick began to do business with Republic. In February, March, and April of 1996, Republic returned a series of checks drawn on Schick's fiduciary accounts for insufficient funds without reporting the transactions to the Lawyers' Fund. Republic also returned at least two checks marked "Refer to Maker" on a separate Schick account. None of the plaintiffs had funds in this account or received one of these returned checks.

Based on the foregoing facts, the plaintiffs' second amended complaint alleged four state-law claims: fraud and aiding and abetting fraud, breach of fiduciary duty and aiding and abetting breach of fiduciary duty, negligence, and commercial bad faith. The district court granted the defendants' Rule 12(b)(6) motion to dismiss these claims, reasoning that because the plaintiffs had failed to allege facts sufficient to support a finding of proximate cause for their RICO claim, they similarly failed to do so for their state-law claims:

> There is no principled distinction between the basis for dismissing the RICO claims on proximate-causation grounds and the basis for similarly dismissing the state claims requiring proximate causation. The plaintiffs do not argue that they have established proximate causation; rather, they contend that there is a causal connection between the defendants' conduct and their injuries. A causal connection, however, only establishes that "but for" defendants' actions the plaintiffs would not have been incurred their injuries; by contrast, proximate causation requires an additional step—that defendants' actions were a substantial factor in plaintiff's injuries and that those injuries were reasonably foreseeable to the defendants; thus, even if plaintiffs could establish but-for causation, that is not sufficient to establish proximate causation.

*Lerner v. Fleet Bank, N.A.,* No. 98–7778, 2005 WL 2064088, at \*6, 2005 U.S. Dist. LEXIS 18209, at \*19 (E.D.N.Y. Aug.6, 2005).

The plaintiffs appeal.

## DISCUSSION

### I. Standard of review.

■ We review de novo both the district court's interpretation of state law, *Colavito v. N.Y. Organ Donor Network, Inc.,* 438 F.3d 214, 220 (2d Cir.2006), and its grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir. 2006).

### II. RICO Proximate Cause v. Common Law Proximate Cause

RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "In order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of [18 U.S.C] § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Svs., Inc.,* 271 F.3d 374, 380 (2d Cir.2001). "RICO's use of the clause 'by reason of' has been held to limit standing to those plaintiffs who allege that the asserted RICO violation was the legal, or proximate, cause of their

injury, as well as a logical, or 'but for,' cause." *Id.*

▮ There is no little confusion in the case law about the meaning and proper use of the term "proximate causation" in the RICO context.[3] When a plaintiff brings suit under RICO—as with any "suit on a statute"—he or she "must show both that he [or she] is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent." *Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234, 237 (2d Cir.), *cert. denied,* 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996); *see also Anza v. Ideal Steel Supply Corp.,* —— U.S. ——, ——, 126 S.Ct. 1991, 1997, 164 L.Ed.2d 720 (2006) (finding no proximate cause to support the plaintiff's RICO suit because "[t]he cause of [the plaintiff's] asserted harms ... is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)"). When used in this context, the term "proximate causation" thus takes on a meaning that is different from its ordinary meaning at common law:

> At common law, so long as the plaintiff category is foreseeable, there is no requirement that the risk of injury to the plaintiff, and the risk of the harm that actually occurred, were what made the defendant's actions wrongful in the first place. With statutory claims, the issue is, instead, one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the "mischief" the statute sought to avoid. *See Gorris v. Scott,* L.R. 9 Ex. 125 (1874) (preamble of statute made clear that the "mischief" the statute sought to prevent was only disease and did not encompass the risk of losing sheep off the side of a ship).

*Abrahams,* 79 F.3d at 237 (footnote omitted). As we explained in *Abrahams,* the "use of 'no proximate cause' language as the ground for dismissal in statutory cases frequently leads to confusion when the issue of proximate cause is raised in related common law claims" because the phrase "proximate cause" may cover a greater or lesser swath of injuries and victims when used in the statutory context. *Id.* at 237 n. 3.[4]

▮ Our conclusion in *Lerner I* that the plaintiffs had not pleaded facts sufficient to support a finding of proximate cause in the RICO action, therefore, does not necessarily mean that their injuries were, under the facts alleged, not proximately caused by the banks' actions for purposes of the plaintiffs' claims under the common law. In *Abrahams,* for example, we concluded that the plaintiff could not bring a RICO suit because he "was neither an intended target of the scheme nor an intended beneficiary of the laws prohibiting it." *Abrahams,* 79 F.3d at 238. But we also concluded that "the RICO ruling is

---

**3.** *See Baisch v. Gallina,* 346 F.3d 366, 373 (2d Cir.2003) (explaining that our test for proximate cause under RICO incorporates concepts of statutory standing and zones of interest).

**4.** For these reasons, the *Abrahams* Court suggested abandoning the "proximate cause" phrasing all together. *See id.* While the substance of the analysis in *Abrahams* has never been doubted, we subsequently resolved to adhere to the "proximate causation" termi-

nology employed by the Supreme Court in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). *See Lerner I,* 318 F.3d at 121 n. 6 (explaining that in *Abrahams,* "we merely sought to apply the same standing test endorsed by the *Holmes* Court under a more precise terminology"); *see also Laborers Local 17 Health & Benefit Fund v. Phillip Morris, Inc.,* 191 F.3d 229, 234 n. 3 (2d Cir.1999).

not dispositive of [the plaintiffs'] negligence claim." *Id.* at 239. "[T]he duty to act with reasonable care establishes a general standard of conduct and is not limited to protecting certain classes of person from particular kinds of harms." *Id.* at 239–40.[5]

Even when stemming from the same fact pattern, then, proximate causation may be present or absent depending on the cause of action under which the plaintiff brings suit.[6] In *Lerner I*, we concluded that the plaintiffs' injuries were not proximately caused by the defendants' *racketeering activity*, not that their injuries were not proximately caused by the defendants' *conduct.* Indeed, we have subsequently interpreted our decision in *Lerner I* to stand for the proposition that "a plaintiff does not have standing if he suffered an injury that was indirectly (and hence not proximately) caused by the racketeering activity or RICO predicate acts, *even though the injury was proximately caused by some non-RICO violations committed by the defendants.*" *Baisch v. Gallina,* 346 F.3d 366, 373 (2d Cir.2003) (em-

phasis added). RICO and common-law claims will often depend on different chains of causation stemming from the same underlying conduct. Accordingly, even though we concluded in *Lerner I* that there was no proximate causal connection between the plaintiffs' injuries and RICO violations under the facts as alleged, the district court erred in failing to determine whether the plaintiffs had nonetheless alleged a proximate causal connection between the plaintiffs' injuries and the defendants' common-law tortious conduct.

The district court's error is understandable in light of the plaintiffs' failure to revise the bulk of their complaint on remand or to display alternate theories of causation with any prominence. The plaintiffs instead emphasized before the district court the same theory of causation that they had previously argued in support of their RICO claim: that the plaintiffs' losses resulted from the banks' conspiracy to corrupt the Lawyers' Fund. It is not altogether impossible that the same chain of causation may, in some circumstances,

---

5. There may be other important differences between assessing proximate causation for RICO claims and for common-law torts:

> In practice, our cases have held RICO plaintiffs to a more stringent showing of proximate cause than would be required at common law. Thus, at common law, the element of foreseeability is generally satisfied by a showing that the plaintiff was in a foreseeable category of persons who might be harmed. And this is so in some common law cases even when the type of harm may be unforeseeable. But RICO cases, in order to combat the specific mischiefs that the RICO statute was designed to address, seem to require that the kind of harm the victim suffered be foreseeable as well. Similarly, it is usually easier for intervenors to break the chain of causation in RICO than it is at common law.

*Moore v. PaineWebber, Inc.,* 189 F.3d 165, 179 (2d Cir.1999) (Calabresi, J., concurring) (citations omitted).

6. In *Laborers Local 17* we declared that "analogous principles to those that doomed plaintiffs' RICO causes of action also bar plaintiffs' common law fraud and special duty actions." *Laborers Local 17,* 191 F.3d at 243. But in that case, we concluded that there was no "direct" link between any of the defendants' actions and any of the plaintiffs' injuries, i.e., that the plaintiff had been injured by a third party, not by the defendant. *See id.* at 239 ("Being purely contingent on harm to third parties, these injuries are indirect."). Because proximate cause under RICO and under New York common law each requires a showing of "direct injury," our conclusion that such injury was lacking was equally applicable to both the federal and state causes of action. *See also Anza,* — U.S. at ——, 126 S.Ct. at 1998 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

fail to establish proximate cause under RICO and still support proximate cause for a common-law claim. *See Moore,* 189 F.3d at 179 (Calabresi, J., concurring) ("[I]t is usually easier for intervenors to break the chain of causation in RICO than it is at common law."). But this particular theory of liability, whether marshaled in support of a RICO claim or a common-law negligence claim, rests on assumptions that are "inherently speculative," *Lerner I,* 318 F.3d at 124. *See, e.g.,* Part III.A., below (finding this theory insufficient to establish proximate cause for negligence claim against banks in which plaintiffs' funds were not deposited); *cf. Laborers Local 17,* 191 F.3d at 243 (concluding that, under both RICO and common-law fraud, plaintiffs' injuries were too indirect because the defendant allegedly harmed a third party, not the plaintiff bringing the instant suit).

The plaintiffs have lately come to the view that they were mistaken in focusing on the alleged conspiracy to corrupt the Lawyers' Fund in pursuing their common-law claims. *See* Oral Arg. Tr. of April 26, 2006, at 46 ("If you want to tell me that it could have been argued better or it shouldn't have been—the emphasis shouldn't have been on the [L]awyers['][F]und, given the nature of the case and the Second Circuit's ruling in the prior appeal—you know, if I have to, I'll say sure, okay."). But we disagree with the defendants' assertion that the plaintiffs have waived all alternative theories of causation. The complaint separately alleges other such theories for each of the four state-law claims. *See* Second Am. Compl. ¶¶ 294–96, 304–06, 320–22, 328–30.

We now consider each of the plaintiffs' theories as to each state-law claim in turn.

III. Negligence

■ To establish a prima facie case of negligence under New York law, "a plain-

tiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon ex rel. Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294, 499 N.Y.S.2d 392, 392 (1985); *see also King v. Crossland Sav. Bank,* 111 F.3d 251, 259 (2d Cir.1997).

*A. Joint and Several Liability to All Plaintiffs*

■ Each plaintiff appears to assert a negligence claim against each defendant bank, whether or not Schick ever deposited that particular plaintiff's funds with that particular bank. We do not think any of the plaintiffs has stated a claim for negligence against banks in which their funds were not deposited.

■ As a general matter, "[b]anks do not owe non-customers a duty to protect them from the intentional torts of their customers." *In re Terrorist Attacks on Sept. 11, 2001,* 349 F.Supp.2d 765, 830 (S.D.N.Y.2005); *see also Renner v. Chase Manhattan Bank (Renner I ),* No. 98–926, 1999 WL 47239, at *13–*14, 1999 U.S. Dist. LEXIS 978, at *40 (S.D.N.Y. Feb.3, 1999); *Century Bus. Credit Corp. v. N. Fork Bank,* 246 A.D.2d 395, 396, 668 N.Y.S.2d 18, 19 (1st Dep't 1998) ("[T]o hold that banks owe a duty to their depositors' creditors to monitor the depositors' financial activities so as to assure the creditors' collection of the depositors' debts would be to unreasonably expand banks' orbit of duty."). As a New York trial court concluded in another Schick-related case, "a bank has no duty to customers of other banks. With billions of banking transactions occurring in New York alone, this would be the equivalent of making New York banks liable to the world's banking public." *Eschel v. Fleet Bank,* Index No.

600809/98, slip op. at 6–7 (N.Y.Sup.Ct. 2003) (footnote omitted).

Even if the banks did owe them a duty of care, the plaintiffs' allegations could not establish proximate cause with respect to banks that did not hold their funds. The plaintiffs argue that if any of the banks had reported Schick's misappropriation of funds, the bar disciplinary committee would have intervened sooner and prevented Schick from defrauding his future clients. But as discussed in Part II, above, we think that, whether alleged as a RICO claim or not, the banks' failure to report Schick's overdrafts is too far removed from the damages Schick subsequently caused to persons who never deposited funds with the bank and who participated in future transactions to which the bank was not a party. To find proximate causation in this context would, in effect, require a bank that failed to report an attorney's overdrafts on a fiduciary account to be an insurer for any damages that lawyer subsequently causes to any of his or her future clients. By the plaintiffs' reasoning, the banks could also be liable for any hypothetical malpractice action against Schick based on poor performance at trial or bad legal advice in unrelated cases. Liability for negligence does not extend that far. "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 287, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring in judgment).

We therefore affirm the judgment of the district court dismissing the second amended complaint to the extent that the plaintiffs seek to recover from banks in which their funds were never deposited on a theory of negligence.

*B. Each Bank's Liability to Plaintiffs with Funds Deposited at that Bank*

■ Several plaintiffs also allege that Schick deposited their funds in fiduciary accounts with one or more of the three defendant banks. The analysis of negligence in these circumstances is different.

■ As a general matter, "a depositary bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation." *Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.*, 280 A.D.2d 653, 654, 721 N.Y.S.2d 94, 95 (2d Dep't 2001); *see also Grace ex rel. Fox v. Corn Exch. Bank Trust Co.*, 287 N.Y. 94, 102, 38 N.E.2d 449, 452 (1941). "The bank has the right to presume that the fiduciary will apply the funds to their proper purposes under the trust." *Bischoff ex rel. Schneider v. Yorkville Bank*, 218 N.Y. 106, 111, 112 N.E. 759, 760 (1916); *see also Clarke v. Pub. Nat'l Bank & Trust Co. of N.Y.*, 259 N.Y. 285, 290, 181 N.E. 574, 576 (1932). As noted, we have held that this general principle applies to Attorney Trust and IOLA accounts. *See Peoples Westchester Sav. Bank*, 961 F.2d at 332 ("In maintaining an IOLA account, the lawyer, not the bank, is charged with a fiduciary duty to the client.").

■ Nevertheless, "a bank may be liable for participation in [such a] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." *In re Knox*, 64 N.Y.2d 434, 438, 477 N.E.2d 448, 451, 488 N.Y.S.2d 146, 149 (1985). "Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly." *Bischoff*, 218 N.Y. at 113, 112 N.E. at 761. "Having such knowledge,

[the bank is] under the duty to make reasonable inquiry and endeavor to prevent a diversion." *Id.* at 114, 112 N.E.2d at 761; *see also Norwest Mortgage,* 280 A.D.2d at 654, 721 N.Y.S.2d at 95 ("Facts sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated will trigger [such] a duty of inquiry on the part of a depositary bank, and the bank's failure to conduct a reasonable inquiry when the obligation arises will result in the bank being charged with such knowledge as inquiry would have disclosed."). Although "[s]mall overdrafts are generally insufficient to trigger a duty of inquiry," *id.; see also Grace,* 287 N.Y. at 104–05, 38 N.E.2d at 453, the bank's duty may be triggered by "chronic insufficiency of funds," *Norwest Mortgage,* 280 A.D.2d at 654, 721 N.Y.S.2d at 95; *see also Zaz–Huff Inc. v. Chase Manhattan Bank, N.A.,* 277 A.D.2d 59, 61, 717 N.Y.S.2d 11, 12 (1st Dep't 2000) (stating that "evidence of overdrafts against these accounts, or of any other suspicious activity in such accounts[,] . . . would have put Chase on notice of possible impropriety").

Although they invoke this line of cases generally, the plaintiffs rely primarily on *Home Savings of America, FSB v. Amoros,* 233 A.D.2d 35, 661 N.Y.S.2d 635 (1st Dep't 1997). There, the First Department concluded that "[t]here is, at the very least, a factual issue as to whether the chronic and extremely serious insufficiency of funds in the mortgage trust account in early October 1994, combined with the contemporaneous and roughly commensurate sapping of that account into other [of the bank's] accounts plainly being utilized by the account fiduciary . . . for nontrust purposes was sufficient to place [the bank] on notice of the misappropriation." *Id.* at 40–41, 661 N.Y.S.2d at 638. "[A]mong the various indicia of fiduciary misappropriation, surely account insufficiency must rank very highly, revealing as it does a telling disparity between entrusted funds and fiduciary expenditures which, in turn, may be, and often is, indicative of trust withdrawals for nontrust purposes." *Id.* at 41, 661 N.Y.S.2d at 638.

The *Home Savings* court also emphasized that a bank's duty to report bounced checks on IOLA accounts reflects the fact that overdrafts are particularly probative in signaling misappropriation:

"Disciplinary counsel nationwide know from experience that a 'bounced check' on a lawyer's trust account is an obvious signal that law clients' money may be in jeopardy" (Alter, Outside Counsel, *Coming Jan. 1: The Dishonored Check Notice Rule,* NYLJ, Nov. 19, 1992, at 1, col 1, at 4, col 4). Indeed, it is precisely because trust account insufficiency is considered such a reliable sign of fiduciary misappropriation that depositary banks maintaining attorney trust accounts must make a dishonored check report to the Lawyers' Fund for Client Protection "whenever a properly payable instrument is presented against an attorney special, trust or escrow account which contains insufficient available funds, and the banking institution dishonors the instrument for that reason" (22 NYCRR § 1300.1[c] ).

*Id.,* 661 N.Y.S.2d at 638–39. The First Department concluded that, "[a]lthough we are not of the view that the bank's evident default in the performance of its regulatory obligation to make a report of check dishonor suffices to establish its liability for the loss occasioned by [the defrauder's] misappropriation, we do think such default may be adduced as some evidence of the bank's negligence." *Id.* at 41–42, 661 N.Y.S.2d at 639.

Fleet and Republic argue that Schick's relevant accounts at their banks were not properly designated as attorney fiduciary

accounts—rather they were labeled simply "Attorney at Law"—and that the banks therefore had no duty to investigate under *Home Savings*. But according to the plaintiffs' complaint, whether or not the accounts were titled IOLA accounts, the banks had actual knowledge that the accounts were intended to be trust accounts for client funds. For purposes of this Rule 12(b)(6) motion, of course, we assume that allegation to be true. *Cf. Eschel v. Fleet Bank*, Index No. 600891/98, slip. op. at 7 (N.Y.Sup.Ct.2003) (declaring, in another Schick-related case, that "[i]n the complaint, plaintiffs conclusorily allege deposits into 'de facto' attorney escrow accounts .... Eventually, plaintiffs must establish that their funds were deposited in such accounts. However, at the pleading stage, all that is necessary is that defendants have notice of plaintiffs' claim. They do.").

Sterling concedes that its accounts were labeled as IOLA accounts, but instead argues that under New York Judiciary Law § 90, it was required to report only those overdrafts that were dishonored due to insufficient funds and that, under New York law, if the bank chooses to honor the overdraft, it need not report the attorney's overdraft to the Lawyers' Fund. Sterling notes that the ABA Model Rules—unlike New York law—suggest that financial institutions report *all* overdrafts, *see* Model Rules for Client Protection (American Bar Association Center for Professional Responsibility 1995); Model Rules for Trust Account Overdraft Notification, R. 2 (1995). Sterling therefore argues that New York's notification law represents a considered policy choice to depart from a stricter reporting requirement suggested by the ABA. But whether or not Sterling violated New York Judiciary Law § 90 by failing to report the overdrafts that it honored, still, the fact that Schick was overdrawing his fiduciary accounts constituted strong evidence that he was, at the very least, mishandling his clients' funds.[7] The fact that a tortfeasor complies with relevant laws and regulations does not insulate it from liability if it fails to act objectively reasonably. *See* Restatement (Second) of Torts § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."); *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 91 (2d Cir.2006) (citing section 288C in the context of negligence under the Federal Employers' Liability Act); *Charter Oak Fire Ins. Co. v. Nat'l Wholesale Liquidators*, 279 F.Supp.2d 358, 361 n. 3 (S.D.N.Y.2003) (citing section 288C); *Royal Ins. Co. of Am. v. RU–VAL Elec. Corp.*, 918 F.Supp. 647, 658 (E.D.N.Y.1996) (same).

Once Schick began repeatedly to overdraw on his attorney trust accounts at a defendant bank, that bank had a duty under *Home Savings* to make reasonable inquiries and to safeguard attorney trust funds from Schick's misappropriation. The court in *Home Savings* noted that a breach of duty had been properly alleged when "not one but 11 checks in very substantial amounts were dishonored in a context of long-pending account insufficiency." *Home Savings*, 233 A.D.2d at 42, 661 N.Y.S.2d at 639. The scale and scope of

---

**7.** Similarly, whether or not Schick's accounts at Fleet and Republic were actually subject to the reporting requirements of N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.46, the banks are alleged to have had actual knowledge that client funds were deposited there. This knowledge triggers a duty under *Home Savings* regardless of whether the banks were obligated to report the bounced checks to the Lawyers' Fund.

Schick's pattern of dishonored checks easily exceeds those in *Home Savings*.

*Home Savings* also makes clear that the banks' alleged breaches of their duty to investigate and, if necessary, safeguard the funds in its trust account, would qualify as a proximate cause of the clients' losses. *See id.* ("[T]here can be little doubt in light of the results of the ... audit [in question] or the bank's own internal investigation performed [during the following month,] that a reasonable investigation by the bank initiated at an earlier date would have uncovered [the] embezzlement.").

 Republic argues that plaintiffs who deposited funds in Republic accounts cannot show causation because Schick did not begin overdrawing on those accounts until early 1996, and, therefore, even if the banks had reported those checks dishonored for insufficient funds to the Lawyers Fund, Schick would still not have been disciplined before his scheme collapsed in April. But whether or not the disciplinary authorities would have disbarred Schick in time to protect the clients' funds, Republic could have acted immediately to protect the funds as soon as it discovered Schick's misappropriation. By ignoring evidence of Schick's misconduct and allowing him to continue to use Republic accounts, Republic allegedly allowed itself to become a conduit for Schick's activities. Like the defendant held liable in *Bischoff*, "by supinely paying, under the facts here, ... the subsequent checks of [the trustee], it became privy to the misapplication." *Bischoff*, 218 N.Y. at 114, 112 N.E. at 762; *see also Grace*, 287 N.Y. at 107, 38 N.E.2d at 454 ("By ignoring these facts and their necessary implications, the bank became a guilty participant in the trustee's embezzlement of trust funds deposited in the trust account in the bank and from that date it became liable as a joint wrongdoer for all moneys which the trustee embez-

zled."); *Bassman v. Blackstone Assocs.*, Index No. 600891/98, slip op. at 8 (N.Y.Sup.Ct.1999) (concluding, in another Schick-related action, that "[m]uch like the court in ... *Home Savings*, this Court is constrained to find that at the very least these fact[s] sufficiently plead a cause of action for negligence").

Accordingly, we vacate the judgment of the district court to the extent that it dismissed the plaintiffs' claims for negligence against a defendant bank in which his, her, or its funds were deposited.

## III. Fraud

Federal Rule of Civil Procedure 9(b) sets forth a heightened pleading standard for allegations of fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." We have explained that in order to comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

 Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R.Civ.P. 9(b). But because "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] ... plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks and citation omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

### A. Fraudulent Misrepresentation

Under New York law, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Kaufman v. Cohen*, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157, 165 (1st Dep't 2003).[8]

Only one plaintiff, Regal Trade, has alleged an affirmative representation that it relied upon to its detriment. According to the complaint:

[U]pon receipt of the Notice of Dishonor from Holm & Drath's bank, accompanying the return of Schick's checks unpaid, marked "Refer to Maker", as aforesaid, Mark Karasick [Regal Trade's representative], telephoned Sterling's main office in New York, from New Jersey, spoke with Rudolph, and asked why Schick's checks were returned. Rudolph falsely and fraudulently responded that there were "back office problems", which had nothing to do with Schick, but as a result of which the check was returned and he should call Schick and arrange to get replacement checks. Mr. Karasick

directly asked Rudolph on that occasion whether there were sufficient funds to cover the returned check, to which Rudolph falsely and fraudulently affirmatively responded that there were sufficient funds to deposit.

Second Am. Compl. ¶ 209. The complaint further states that in reliance on the defendant's fraudulent misrepresentations, Regal Trade continued to entrust its funds to Schick. *Id.* at ¶ 289. These allegations are sufficient to state a claim for fraud by Regal against Sterling.

None of the other plaintiffs, however, points to any misrepresentation from a defendant bank on which it relied. Besides Regal Trade's phone call to Sterling, the only other possible misrepresentations alleged in the second amended complaint are the "Refer to Maker" stamps placed on Schick's dishonored checks. Only one of the plaintiffs—Crestfield Associates—asserts that it received a "Refer to Maker" check. But Crestfield cannot show any reliance on this statement because it had already made its one and only investment with Schick six weeks earlier.

With the exception of Regal Trade's claim against Sterling, therefore, we affirm the judgment of the district court insofar as it dismissed the plaintiffs' claims for fraud.

### B. Fraudulent Concealment

"[I]nstead of an affirmative misrepresentation, a fraud cause of action may

**8.** We have at times recited a slightly different formulation. *See, e.g., Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997) ("Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) *with an intent to defraud,* and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." (emphasis added)). We need not resolve at

this time whether that formulation is consistent with the First Department's. *Cf., e.g., Houbigant, Inc. v. Deloitte & Touche, LLP*, 303 A.D.2d 92, 100, 753 N.Y.S.2d 493, 499 (1st Dep't 2003) ("[T]he plaintiff must only allege facts from which it may be inferred that the defendant was aware that its misrepresentations would be reasonably relied upon by the plaintiff, not that the defendant intended to induce the particular acts of detrimental reliance ultimately undertaken by the plaintiff.").

be predicated on acts of concealment where the defendant had a duty to disclose material information." *Kaufman*, 307 A.D.2d at 119–20, 760 N.Y.S.2d at 165. We have explained that "[d]uring the course of negotiations surrounding a business transaction, a duty to disclose may arise in two situations: first, where the parties enjoy a fiduciary relationship, and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984) (citations omitted). As several district courts have suggested, such a duty "usually arises ... in the context of business negotiations where parties are entering a contract." *Ray Larsen Assocs. v. Nikko Am., Inc.*, No. 89–2809, 1996 WL 442799, at *5, 1996 U.S. Dist. LEXIS 11163, at *14 (S.D.N.Y. Aug.6, 1996); *see also Ryan v. Hunton & Williams*, No. 99–5938, 2000 WL 1375265, at *5, 2000 U.S. Dist. LEXIS 13756, at *16 (E.D.N.Y. Sept.20, 2000); *Renner v. Chase Manhattan Bank* (*Renner· II* ), No. 98–926, 2000 WL 781081, at *9 n. 5, 2000 U.S. Dist. LEXIS 158552, at *28 n. 5 (S.D.N.Y. June 16, 2000); *Williams v. Bank Leumi Trust Co.*, No. 96–6695, 1998 WL 397887, at *8, 1998 U.S. Dist. LEXIS 10636, at *22 (S.D.N.Y. July 15, 1998).

 Even if the withholding of information could constitute fraudulent concealment in the absence of business negotiations, the plaintiffs would still be required to show that they relied on the banks' fraudulent failure to disclose. No plaintiff has alleged any such reliance. Instead, they claim reliance on "(i) the fact that Schick was an attorney admitted to the practice of law in the State of New York in good standing, and (ii) the integrity of 'The New York State Attorney Disciplinary System.'" Second Am. Compl. ¶ 234. None of them alleges that he or she contacted the Appellate Division to determine whether there had been previous disciplinary actions taken against Schick. In the absence of an allegation that the plaintiffs actually relied on the banks' omissions, they have not stated a claim for fraudulent concealment.

## C. Aiding and Abetting Fraud

 To establish liability for aiding and abetting fraud, the plaintiffs must show "(1) the existence of a fraud; (2)[the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 252 (S.D.N.Y. 2005) (internal quotation marks and citations omitted); *see also Franco v. English*, 210 A.D.2d 630, 633, 620 N.Y.S.2d 156, 159 (3d Dep't 1994) (requiring "nexus between the primary fraud, [defendant's] knowledge of the fraud and what it did with the intention of advancing the fraud's commission").

The leading opinion interpreting New York law in this respect is *Kolbeck v. LIT America, Inc.*, 939 F.Supp. 240 (S.D.N.Y. 1996), in which Judge Mukasey concluded that "[t]ogether, *H2O Swimwear*[*Ltd. v. Lomas*, 164 A.D.2d 804, 560 N.Y.S.2d 19 (1st Dep't 1990),] and *AA Tube Testing* [*Co. v. Sohne*, 20 A.D.2d 639, 246 N.Y.S.2d 247 (2d Dep't 1964),] demonstrate that actual knowledge is required to impose liability on an aider and abettor under New York law." *Id.* at 246, 246 N.Y.S.2d 247; *see also JP Morgan Chase Bank*, 406 F.Supp.2d at 252 n. 4 ("[T]he weight of the case law ... defines knowledge in the context of an aiding and abetting claim as actual knowledge.").

 We think the plaintiffs in this case have failed to allege actual knowledge of

fraud with the particularity necessary to survive the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Armstrong v. McAlpin,* 699 F.2d 79, 92–93 (2d Cir.1983) (applying Rule 9(b) to claim for aiding and abetting fraud).

Although the plaintiffs conclusorily allege that the banks had actual knowledge, we think that they failed to plead facts with the requisite particularity to support that claim. The plaintiffs allege in detail that the banks knew that Schick engaged in improper conduct that would warrant discipline by the Appellate Division, but those alleged facts do not give rise to the "strong inference," required by Federal Rule of Civil Procedure 9(b), of actual knowledge of his outright looting of client funds. *See, e.g., Ryan,* 2000 WL 1375265, at * 9, 2000 U.S. Dist. LEXIS 13756, at *15 ("Allegations that Chemical suspected fraudulent activity ... do not raise an inference of actual knowledge of Wolas's fraud."); *Renner II,* 2000 WL 781081, at *12, 2000 U.S. Dist. LEXIS 158552, at *36 (stating that although bank had previously "rejected the transactions on the basis that they were potential vehicles for fraud, there is no factual basis for the assertion that Chase officials actually knew that the fraud was, in fact, occurring."). We therefore affirm the judgment of the district court insofar as it dismissed the plaintiffs' claims for aiding and abetting fraud.

IV. Commercial Bad Faith

■ The New York Court of Appeals fashioned the doctrine of "commercial bad faith" as an exception to the general rule that a bank is absolved of liability for a check made out to a fictitious payee when the maker knows that the payee is fictitious. *See* N.Y. U.C.C. Law § 3–405. The doctrine provides that a bank may be held liable if it in fact knows of the fraud and participates in it. *See Prudential–Bache*

*Sec., Inc. v. Citibank, N.A.,* 73 N.Y.2d 263, 274–75, 536 N.E.2d 1118, 1124, 539 N.Y.S.2d 699, 705 (1989); *Getty Petroleum Corp. v. Am. Exp. Travel Related Servs. Co.,* 90 N.Y.2d 322, 331, 683 N.E.2d 311, 316, 660 N.Y.S.2d 689, 694–95 (1997). We have considerable doubt whether the doctrine has any applicability to these plaintiffs' claims, which do not allege fraud in the making and cashing of checks. *Cf. Peck v. Chase Manhattan Bank, N.A.,* 190 A.D.2d 547, 548–49, 593 N.Y.S.2d 509, 510–11 (1st Dep't 1993).

■ Even if a claim for commercial bad faith were available in this context, however, the plaintiffs' claims would fail for the same reason as do their claims for aiding and abetting fraud. Claims of commercial bad faith, like claims of fraud, are governed by the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See Wight v. BankAmerica Corp.,* 219 F.3d 79, 91–92 (2d Cir.2000). A claim of commercial bad faith requires that the bank have "actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in a fraudulent scheme." *Prudential–Bache,* 73 N.Y.2d at 275, 536 N.E.2d at 1124–25, 539 N.Y.S.2d at 706. "[A] transferee's lapse of wary vigilance, disregard of suspicious circumstances which might have well induced a prudent banker to investigate and other permutations of negligence are not relevant considerations." *Getty Petroleum,* 90 N.Y.2d at 331, 683 N.E.2d at 316, 660 N.Y.S.2d at 694–95. Because the plaintiffs fail to plead facts giving rise to the "strong inference" of actual knowledge of fraud required by Federal Rule of Civil Procedure 9(b), we affirm the district court's dismissal of their claim for commercial bad faith. *Cf. Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* No. 98–4960, 1999 WL 558141, at *8, 1994 U.S. Dist. LEXIS 11599, *22 (S.D.N.Y. July 30,

1999) (citing *Getty* and granting Rule 12(b)(6) motion to dismiss claim of commercial bad faith for failure to plead adequately defendant's actual knowledge of fraud).

## V. Aiding and Abetting Breach of Fiduciary Duty

 As already noted, a bank generally has "no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation." *Norwest Mortgage*, 280 A.D.2d at 654, 721 N.Y.S.2d at 95. Some of the plaintiffs here have nonetheless stated claims against some of the defendant banks for aiding and abetting Schick's breach of fiduciary duty.

 "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169; *accord In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir.2005); *see also Wechsler v. Bowman*, 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941) ("Any one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust."). With respect to the second requirement, "[a]lthough a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169. And "[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." *Id.* at 126, 760 N.Y.S.2d at 170.

The complaint alleges that "each defendant had actual knowledge that Schick and his law firms violated their fiduciary duties to some or all of the plaintiffs, *inter alia*, by reason of the fact that Schick Attorney Fiduciary Accounts were overdrawn; numerous checks written on Schick Attorney Fiduciary Accounts were dishonored for insufficient funds; and Schick on numerous occasions ... transferred funds from the Schick Attorney Fiduciary Accounts to his personal account(s)." Second Am. Compl. ¶ 303.

As discussed above, these "red flags," as alleged, were insufficient to establish a claim for aiding and abetting fraud because, although they may have put the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge of Schick's outright theft of client funds. But the claim for aiding and abetting a breach of fiduciary duty does not depend on such knowledge of outright theft. Schick's commingling of funds was not only an *indication* of a breach of fiduciary duty—it was, in and of itself, a breach. *See* ABA Model Rules for Trust Account Overdraft Notification, R.2, *available at* http://www.abanet.org/cpr/client-pro/orule2.html (last visited, June 24, 2006) ("In light of the purposes of this rule, and the ethical proscriptions concerning the preservation of client funds and commingling of client and lawyer funds, it would be improper for a lawyer to accept 'overdraft privileges' or any other arrangement for a personal loan on a lawyer trust account."). We therefore conclude that the bank's actual knowledge of this breach of duty may provide the basis for an aiding and abetting claim.

 As noted above, to establish the banks' knowing participation, the

plaintiffs must also show that the banks gave Schick "substantial assistance" in breaching his fiduciary duty to his clients. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. However, the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Kaufman,* 307 A.D.2d at 126, 760 N.Y.S.2d at 170; *see also Sharp,* 403 F.3d at 50–51.

■ The defendants argue that they could not have given "substantial assistance" if they did no more than passively fail to report Schick's bounced checks because they owed no independent fiduciary duty to Schick's clients. But as discussed above with regard to the plaintiffs' negligence claim, banks *do* have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled. "Neither a large bank nor a small bank may urge that it is ignorant of facts clearly disclosed in the transactions of its customers with the bank ... nor may a bank close its eyes to the clear implications of such facts." *Grace,* 287 N.Y. at 107, 38 N.E.2d at 454. As in *Bischoff,* the plaintiffs here allege that the banks had sufficient information to place them "under the duty to make reasonable inquiry and endeavor to prevent a diversion." *Bischoff,* 218 N.Y. at 114, 112 N.E. at 761.

The rule that liability for aiding and abetting is limited to those with a duty to disclose is based on the common-law principle that "since there is ordinarily no duty to take affirmative steps to interfere, mere presence at the commission of the wrong ... is not enough to charge one with responsibility." W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 46 at 323–24 (5th ed.1984); *see Kolbeck,* 939 F.Supp. at 247 (incorporating the common-law requirement into the test for aiding and abetting breach of fiduciary duty). We think that the duty "to prevent a diversion" described in *Bischoff* and *Home Savings*—whether or not it is specifically designated as a "fiduciary" duty—encompasses such a duty to interfere as that contemplated by the First Department in *Kaufman.*[9]

Because of their duty to prevent a diversion, the defendant banks in this case stand on very different footing from, for example, the defendants in *Sharp,* who had "no affirmative duty under New York law to inform [the looted corporation], [its] existing creditors, or [its] prospective creditors of [the] fraud," *Sharp,* 403 F.3d at 52 n. 2., no "duty to consider the interests of anyone else," *id.* at 52, and no duty "to precipitate its own loss in order to protect lenders that were less diligent," *id.* at 53. As discussed in Part III.B., above, when put on notice of a misappropriation of trust funds, the banks in this case were obligated to take reasonable steps to prevent the misappropriation that an investigation would uncover.[10]

9. In using the phrase "fiduciary duty," the *Kaufman* court borrowed language from the bankruptcy court in *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.),* 281 B.R. 506, 516 (Bankr.E.D.N.Y. 2002), which had, in turn, borrowed language from Judge Mukasey's opinion in *Kolbeck.* As explained above, *Kolbeck* derived the requirement of a "fiduciary duty owed directly to the plaintiff" from the common law, as recounted

in Prosser & Keeton on the Law of Torts § 46. We doubt that, in repeating the particular phrasing used in the *Kolbeck* opinion, the First Department intended to narrow the doctrine of aiding and abetting or otherwise alter its common-law roots.

10. We need not decide whether the plaintiffs have stated a claim for aiding and abetting breach of fiduciary duty based on the banks'

## VII. Reassignment on Remand

■ Because we have been given no reason whatever to think that the district court will be unable to—or could reasonably be perceived to be unable to—faithfully apply the law on remand, *see Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 146–47 (2d Cir.2000), we deny the plaintiffs' request for reassignment of this case to a different district court judge on remand.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court insofar as it dismissed individual plaintiffs' claims for negligence and for aiding and abetting breach of fiduciary duty against the defendant banks in which those plaintiffs' funds were deposited and insofar as it dismissed plaintiff Regal Trade's claim for fraud against defendant Sterling Bank, and remand. In all other respects, we affirm the judgment of the district court.

"inducing" or "encouraging" the fiduciary breach to occur. *See Sharp Int'l Corp. v. State*

*Street Bank & Trust Co. (In re Sharp Int'l Corp)*, 302 B.R. 760, 774–75 (E.D.N.Y.2003).