2006 FRANK CALANDRA, JR. IRREVOCABLE TRUST; Kristin Hassoun, as Trustee of 2006 Frank Calandra, Jr. Irrevocable Trust; Kara Marie Calandra Charbonneau, as Trustee of 2006 Frank Calandra, Jr. Irrevocable Trust; and Karl Anthony Calandra, as Trustee of 2006 Frank Calandra, Jr. Irrevocable Trust, Plaintiffs,

v.

SIGNATURE BANK CORPORATION, and Cushner & Garvey, LLP, Defendants.

No. 09 CV 08526(GBD).

United States District Court,
S.D. New York.

Aug. 31, 2011.

Leon F. DeJulius, Jr., Roy A. Powell, Jones Day, Pittsburgh, PA, Briana Rose Hulet, Steven C. Bennett, Jones Day, New York, NY, for Plaintiffs.

Robert Manuel Rosenblith, Chestnut Ridge, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge.

2006 Frank Calandra, Jr. Irrevocable Trust (the "Trust") and its Trustees Kristin Hassoun, Kara Marie Calandra Charbonneau, and Karl Anthony Calandra (collectively, "Plaintiffs") brought this suit against Defendants Signature Bank Corporation and Cushner & Garvey, LLP,[1] arising from the depletion of the Trust funds by Former Trustee Edward Stein. Plaintiffs seek relief from Signature Bank based upon its conduct in failing to monitor the account that held the Trust funds and processing withdrawals initiated by Stein. Specifically, Plaintiffs assert claims in the Amended Complaint against Defendant Signature Bank for: gross negligence, breach of contract, aiding and abetting fraud, and violation of sections 4–A–204(1) and 4–401 of the New York Uniform Commercial Code. Plaintiffs moved for partial summary judgment pursuant to Fed. R.Civ.P. 56 granting judgment in Plaintiffs' favor on the gross negligence and UCC claims. Defendant Signature Bank cross-moved for summary judgment dismissing all claims pursuant to Fed. R.Civ.P. 56. Plaintiffs then moved to strike Defendant Signature Bank's motion for summary judgment for being filed four days after the court ordered deadline and violating several Federal and Local Rules of Civil Procedure. Defendant's motion is GRANTED. Plaintiffs' motions are both DENIED.

## BACKGROUND [2]

The Trust was created in 2006 by Frank Calandra, Jr. for the sole purpose of own-

1. Plaintiffs' claims against Defendant Cushner & Garvey were dismissed pursuant to a Stipulation and Order of Dismissal. *See* Docket # 62.

2. All exhibits are located in Plaintiffs' Appendix of Record Evidence, unless otherwise stated.

ing and distributing the proceeds of a life insurance policy that the Trust holds on Frank Calandra's wife, Rosemarie Calandra. Ex. 2, Deposition of Frank Calandra, Jr., at 19, 26; Ex. 1, Trust Agreement, at 000645–66. The Trustees at that time were Edward Stein and Frank Calandra's two children, Kristin Hassoun and Kara Marie Calandra Charbonneau. Ex. 1, CT 000658. Frank Calandra paid into the Trust $750,000, which was enough funds to pay all the premiums through the life of the policy. Ex. 2, at 35; Ex. 3, Trust Account Statement, CT 000733–34; Ex. 4, Contingent Private Annuity Agreement, CT 000757; Ex. 5, Actuarial Certification, CT 000801–04. Until Rosemarie Calandra passed away, the only function of the Trust-and by extension the Trustees-was to pay the premiums. Ex. 1; Ex. 6, Deposition of Kristin Hassoun, at 16; Ex. 7, Deposition of Kara Marie Calandra Charbonneau, at 13.

## A. OPENING THE TRUST ACCOUNT

Signature Bank's business model is built on its bankers creating personal relationships with customers and bringing in new business through customer referrals. Ex. 8, Deposition of Patrick Manzi, at 40–42; Ex. 9, Deposition of John C. Ricchezza, at 83; Ex. 10, Deposition of Lina Fiore, at 14;

Ex. 11, Deposition of Robert Corrado, at 33. Bankers are organized into small Private Client Groups ("PCG") who offer services to clients through a single point of contact, but there is not a dedicated Trust Department. Ex. 8, at 5–24; Ex. 11, at 68. Rather, bankers set up and provide services for accounts established by trusts as with non-trust clients like corporations, partnerships, unincorporated associations, and foundations. Ex. 9, at 60–63; Ex. 8, at 45–46.

In December 2006, the Trust opened an interest bearing account with limited check writing ability at Signature Bank to hold the Trust funds and accomplish the ministerial functions of paying the premiums (hereinafter, the "Trust Account"). Ex. 2, at 31; Affidavit of Patrick Manzi ¶ 2; Amended Complaint ¶ 8. Frank Calandra knew that Stein was opening the Trust Account at Signature Bank. Ex. 2, at 19–20. Frank Calandra also knew that Stein had an established business relationship with Signature Bank. Ex. 2, at 20.[3] The Trust had the same point of contact as Stein: Robert Corrado, Co–Director of the PCG in Signature Bank's New Rochelle office.[4] Ex. 11, at 120–121, 171–172; Ex. 25, Calandra Trust Account Application, SB 00438. Corrado had minimal experi-

---

**3.** It is unclear whether Frank Calandra, Jr., or the other Trustees were aware of the extent of Stein's relationship with Signature Bank. In any event, it is undisputed that Stein had engaged in a number of business dealings with Signature Bank prior to the opening of the Trust Account, including acting as a source of business referrals, and that he continued to do so afterwards. Ex. 8, at 113, 116–118; Ex. 9, at 85–86, 122; Ex. 11, at 117, 121, 128–131, 168–170; Ex. 12, Davis Credit Referral, SB 00382–83; Ex. 14, Account Application of Deetown Entertainment Inc., SB 00481, SB 00476–81; Ex. 15, Stein Letter to Signature re Deetown Entertainment, SB 00886; Ex. 16, Ricchezza Appeal Email, SB 00048; Ex. 17, Deetown Credit Approval Letter, SB 00521; Ex. 18, Davis

Credit Approval Letter, SB 00409; Ex. 19, Brickey Valley Realty Credit Application, SB 00551–56; Ex. 20, Tepper Email to Signature Bank, SB 00054–55; Ex. 21, Stem Account Application, SB 00422–23, 00426; Ex. 22, Stein Credit Override Form, SB 001225; Ex. 23, Stein Credit Approval Letter, SB 00430. Stein was, as a consequence, considered a valuable client to at least his contact at Signature Bank. Ex. 8, at 55–56; Ex. 11, at 96–97, 99–102, 157; Ex. 12, SB 00383. *But see* Ex. 9, at 90–93.

**4.** John Ricchezza was the other Co–Director. Ex. 9, at 21. Isabel Shevlin assisted Corrado and Ricchezza. Ex. 13, at 15.

ence with checking accounts established by trusts, and Signature Bank never provided him with special training on such accounts. Ex. 11, at 21–22, 29–32. Corrado was aware of the documentation needed for a trust client to open an account. Ex. 11, at 21–22, 24–25.

### 1. Application Content

Corrado provided Stein with the account application and allowed Stein to gather the information necessary to open the account. Ex. 11, at 172–174; Ex. 25, Calandra Trust Account Application; Ex. 26, Corrado Cover Letter Accompanying Application, SB 002096.

#### a. Section 1(a)—Business Client Profile

This section asked for the form of the business and a detailed business description. Ex. 25, SB 00433. The Trust Application stated "Trust" and "Insurance Trust," respectively. Ex. 25, SB 00433. This section asked for the business address, the address to which Signature Bank would mail monthly account statements and notices regarding the account. Ex. 25, SB 00433; Manzi Aff. ¶ 5. The Trust Application stated the address of Frank Calandra's office, "258 Kappa Drive; Pittsburgh, PA 15238." Ex. 2, at 64; Ex. 25, SB 00433. Finally, this section asked for the name and contact information of the primary contact. Ex. 25, SB 00433. The Trust Application stated "Edward T. Stein, Trustee." Ex. 25, SB 00433, SB 00436 (listing only Stein's email

address for internet-based account services).

#### b. Section 1(c)—Signers

This section asked for the names of the signers on the account—that is, the person(s) who the client identifies to the bank as authorized to transact business on behalf of the client. Ex. 25, SB 00434. This section also asked for certain personal information about the signers, including title/role, social security number, birth date, identification number, driver's license, and citizenship. Ex. 25, SB 00434. The Trust Application stated that the three Trustees were individually signers: Hassoun, Charbonneau, and Stein. Ex. 25, SB 00434.

#### c. Section 3—Anticipated Account Activity

This section asked whether cash activity was anticipated. Ex. 25, SB 00435. The Trust Application stated "no" for cash deposits and "no" for cash withdrawals. Ex. 25, SB 00435. This section also asked whether wire activity was anticipated. Ex. 25, SB 00435. The Trust Application indicated "no" for incoming wires and "no" for outgoing wires. Ex. 25, SB 00435. However, on July 31, 2007, the Trust changed its account settings on wire activity by submitting a Funds Transfer Agreement.[5] Manzi Aff., Ex. F.

#### d. Section 7—Agreements and Acknowledgment

This section asked the client to acknowledge having received, read, and agreed to various Signature Bank terms and conditions, as provided in Business Bank Depos-

---

5. The Agreement authorized Signature Bank to "honor, execute and to charge" the Trust Account according to funds transfer instructions in Fund Transfer Applications submitted by phone, fax, messenger, or email. Manzi Aff., Ex. F. The Agreement stated that all three Trustees were authorized to initiate wire transfers, also known as Payment Orders, and that "the Bank will act on the instructions

and verifications of the individuals named … until such time as the Bank is notified in writing of changes." The Funds Transfer Agreement was signed only by Stein. Manzi Aff., Ex. F (requesting a signature from the Authorized Signer(s)); Ex. 7, at 40 (Charbonneau admitting that she knew the purpose of the form was to permit funds transfers).

it Account Agreement. Ex. 25, SB 00437; Manzi Aff. ¶ 2; Manzi Aff., Ex. B. In particular, this Agreement provided that "[o]nce a month, the Bank will send at [the client's] address appearing on the Bank's records, a Statement . . . of the Bank Deposit Account balance and activity since the last Statement." Manzi Aff., Ex. B, at 4. This Agreement further provided that "[the client] will exercise reasonable care and promptness in examining such Statement and Checks to discover any errors or irregularity including, but not limited to, any forged, unauthorized or improperly made signatures on . . . a Check" and that "[the client] will notify the Bank promptly in writing of any errors or irregularities, and in no event more than fourteen (14) calendar days after the time that such Statement and Checks . . . were first made available to you." Manzi Aff., Ex. B, at 4, 7. The Trust Application indicates that the Trust agreed to these conditions. Ex. 25, SB 00437.

This section also asked, under the heading "Authorized Signature (Signature Card)," for (1) the name, signature, and title of each individual listed in Section 1(c); (2) a signature by one of the authorized signers verifying the Trust Account's signing authority; and (3) a designation regarding the number of authorized signatures necessary to take action on behalf of the Trust with respect to the Trust Account. Ex. 25, Application, at 00437.[6] The Trust Application listed three Authorized Signers, matching Section 1(c), and was

verified by Rosemarie Calandra. Ex. 25, Application, at 00437. The Trust Application also indicated that the Authorized Signers could act on the Trust Account "Individually." Ex. 25, Application, at 00437.

### e. Trust Agreement Attachment

Signature Bank's Plat Reference Manual ("PRM"), an internal manual that is binding on all employees, sets forth the procedures that must be followed when opening a checking account Ex. 8, at 20–22, 76, 155–57; Ex. 24, Trusteeship Policy, SB 00351–54. In particular, the PRM provides that "the entire original trust agreement" is required, though only copies of "pages naming beneficiary, trustee and listing the signature of the trustee" would be retained. Ex. 24, SB 00354.[7] Stein provided Corrado with a copy of the Trust Agreement. Ex. 11, at 193–194.

### 2. Review and Approval Process

The PRM provides that "[i]t is the trustee's responsibility to ensure that the terms of the trust are adhered to." Ex. 24, SB 00353. Signature Bank has the responsibility under the PRM to: (1) "identify the trustee(s), ensure that the appropriate number of trustees have signed a transaction, and verify the signature(s) of the trustee(s) when conducting business"; and (2) "review the Trust Agreement (or account documents) to ensure that appropriate authorization is ob-

---

6. Stein completed the Signature Card in the following manner. Stein had Rosemarie Calandra sign the verification line (i.e. the second item) before any of the other items were completed. Ex. 2, at 48–49. Stein then had both of the other Trustees sign as Authorized Signers (i.e. the first item). Ex. 6, at 34; Ex. 7, at 23–24. It is unclear whether those Trustees saw any other part of the application and/or whether the third item indicating that the Authorized Signers could act "Individually" was completed at that time. Ex. 6, at 34,

38 (Hassoun testifying that she did not recall when she saw the account application before reviewing it for her deposition); Ex. 7, at 23–24 (Charbonneau testifying that she did not recall seeing the first, third and fourth pages of the application).

7. It is undisputed that these provision governed the opening of the Calandra Trust. Ex. 8, at 155–159; Ex. 11, at 207–208.

tained when processing transactions on the account."[8] Ex. 24, SB 00353–354.

The Trust's application materials were sent to the Operations Department, which subsequently informed Corrado that the application was approved.[9] Ex. 11, at 191. Corrado never personally investigated the Trust Agreement provisions regarding authorized signers, or otherwise discussed the matter with a Signature Bank employee. Ex. 11, at 181, 192. It is unclear who at Signature Bank, if anyone, reviewed the terms. Ex. 8, at 163–164; Ex. 9, at 159; Ex. 13, at 92–94. It is also unclear how Signature Bank, if at all, verified the authority of the individuals listed as Authorized Signers on the Trust Application. Ex. 11, at 181–182; Ex. 8, at 163–167, 178–180; Ex. 13, at 92–94. Section 8 of the application does indicate, however, that a telephone method known as Chex Systems was used. Ex. 25, SB 00438; Ex. 27, SB 001788.

The PRM also provides that the Anti–Money Laundering and Know Your Client Policies and Procedures Manual ("KYC Manual"),[10] another internal manual that is binding on all employees, "must be fol-

lowed prior to opening an account." Ex. 24, SB 00353; Ex. 27, KYC Manual, SB 001733–44, 001755–1800; Ex. 8, at 22–23. Specifically, the KYC Manual provides for the following in Section 8–Signature Use Only of the application: (1) check-off box marked 'other' and explain the settlor/grantor/creator's original source of wealth including the line of business the settlor/grantor/creator was or is currently in and the relationship of the settlor/grantor/creator and beneficiary(ies); and use the " 'signature notes' section of the profile to document the specific names of all the parties involved." Ex. 25, Application, at 00438; Ex. 27, KYC Manual, SB 001759–60. Corrado, nor any other Signature Bank employee, completed this information on the Trust's application. Ex. 25, Application, at 00438; Ex. 11, at 196–197.

## B. STEIN'S CONTACT WITH SIGNATURE BANK TO COMMIT THE FRAUD[11]

### 1. Address Change

Prior to the address change, all account statements were sent to the Pittsburgh

---

**8.** Plaintiffs contend that the Trust Agreement does not authorize the Trustees to act individually with respect to the Trust Account. Plaintiffs identify the following provision: "the functions of the Trustee shall be performed only by agreement of the Trustee or Trustees qualified to pass on the question as provided in these rules, or if more than two, by majority vote." Ex. 1, CT 000662.

**9.** Ultimately, the Trust Account was opened without any communication by Corrado with the other Trustees, Hassoun or Charbonneau. Ex. 11, at 171. It is unclear who, if anyone, at Signature Bank ever contacted the other Trustees regarding the opening of the checking account. Ex. 8, at 170–171; Ex. 11, at 182, 187, 201; Ex. 13, at 94.

**10.** The KYC Manual governs Signature Bank's efforts to "prevent[ ] the use of its operations for criminal purposes" and "ensure the safety of the institution." Ex. 27, SB

001736–37. Signature Bank, as detailed in the KYC Manual, seeks to fulfill this commitment by knowing its clients, monitoring transactions, training all personnel, and remaining alert. Ex. 27, SB 001736; Ex. 8, at 30; Ex. 11, at 69–70 (bankers must "know their client's business to the extent that they are reasonably comfortable that the business is legitimate and the transactions match what the business is").

**11.** Plaintiffs contend that the Trust Agreement did not authorize Stein to perform any of the acts in furtherance of his conspiracy—namely, the address change, wire transfers, or check writing. In addition to requiring the approval of two Trustees, the Trust Agreement explained that Trustees are disqualified from voting on matters that involved their own self-interest. Ex. 1, CT 000661–662.

address and received by Frank Calandra. Ex. 2, at 64–65. Frank reviewed most of them. Ex. 2, at 65. Copies were never provided to Trustees Hassoun or Charbonneau. Ex. 2, at 65.

On August 16, 2007, Stein requested that the Trust Account's address be changed from Frank Calandra's business address in Pittsburgh to c/o Edward Stein Associates, 1044 Northern Blvd., Suite 100, Roslyn, New York. Ex. 29, Address Change Request, SB 00447. The form was signed only by Stein. Ex. 29, SB 00447.

Signature Bank never confirmed the address change with Trustees Hassoun or Charbonneau. Ex. 11, at 219. Signature Bank did send a letter dated August 23, 2007, to the Trust's original mailing address in Pittsburgh. Ex. 34, Address Change Notification Letter, CT 000717. The letter stated that "the address on your account has been changed" and listed the Roslyn address under "New Address" and the Pittsburgh address under "Prior Address." Ex. 34, CT 000717. Also, under "New Address" next to the Roslyn address, the letter had a subheading of "Current Address" with an address for Edward Stein Associates in Lake Success, New York. Ex. 34, CT 000717. Signature Bank admitted that the Notification Letter was "confusing" and was "out of the ordinary." Ex. 8, at 333–334, 337. Frank Calandra received this notification and was also confused, but he never contacted Signature Bank, his Trustee daughters, or Stein regarding it. Ex. 2, at 65–68.[12] Frank Calandra stopped receiving statements in August 2007 but but never expressed any concern. Ex. 2, at 70.

## 2. Transfers

Upon receiving a Funds Transfer Application, the KYC Manual provides that the account officer must "review all wire transfer requests to ensure proper documentation is on file and that wire transfers are consistent with the nature of the client's relationship with Signature and the nature of the client's business or occupation." Ex. 27, SB 001766. The account officer should report any suspicious transactions to the Compliance Department. Ex. 27, SB 001766. The Funds Transfer Agreement provides that: (1) Payment Orders submitted by fax "must contain the signature of an authorized signer"; (2) the authenticity of Payment Order shall be verified by a call-back to "one of those authorized by the Client to verify fund transfers"; and (3) the security procedures are commercially reasonable. Manzi Aff., Ex. F.

Between August 2007 and October 2007, Stein stole $750,000 from the Trust Account by initiating transfers with Signature Bank to send money to his corporate entities and former Defendant Cushner & Garvey. Ex. 44, Trust Account Statement, CT 00019–21. Each transaction was detailed in the monthly account statements mailed to the Trust in accordance with the mailing instructions on file. Manzi Aff. ¶ 3, Ex. C. The other Trustees were unaware of these withdrawals since they did not review or receive any of the monthly bank statements. The transfers depleted the funds in the Trust Account, with only $19,000 remaining in October 2007. Ex. 44.

On August 16, 2007, the same day that Stein changed the Trust Account address, Stein wrote a check from the Trust Account to Prima Capital Corp. in the

---

**12.** Frank Calandra interpreted it as a change to Stein's contact information. Ex. 2, at 67–68.

amount of $100,000.[13][14] Ex. 37, Trust Account Statements, CT 000513–15. Stein also submitted a Funds Transfer Application for a wire transfer of $350,000 to Vibrant Capital Corp. on August 16, 2007. Ex. 7, Trust Account Statements, CT 000513–15; Ex. 36, Funds Transfer Applications, CT 000592–95. A bank employee verified the signature and account balance. Ex. 9, at 180; Ex. 10, at 67–70. Another bank employee performed a call back [15] by contacting Stein [16]—that is, he called to verify that the information contained in the request form had been inputted correctly and to confirm that the client had made the request.[17] Ex. 9, at 177–180, 212–214.

Stein next engaged in three transfers after the address change had been processed. Stein submitted another Funds Transfer Application for a $100,000 wire transfer to Vibrant Capital Corp. on August 31, 2007. Ex. 36, CT 000593. Stein then submitted a Funds Transfer Application for a $100,000 wire transfer to Vibrant Capital Corp. on September 6, 2007. Ex. 36, CT 000594. Finally, on October 23, 2007, Stein submitted a Funds Transfer Application for a $100,000 wire transfer to the law firm Cushner & Garvey. Ex. 36, CT 000595.[18]

On the forms for both the August 31, 2007 and September 6, 2007 requests, the Trust (or Originator) Address was incorrectly listed as Pittsburgh instead of Roslyn, and the Recipient (or Beneficiary) Address was listed as Roslyn. Ex. 36, CT 000593–594. This error was twice caught and corrected by Signature Bank. Ex. 13, at 131–133; Ex. 8, at 298–303. However,

13. Checks over $100,000 are referred to the signature verification system and paid only if the signature is verified or, where the signature is not verified, if the PCG approves it. Ex. 8, at 207–210.

14. This was not the first time that a check was submitted with only one signature. Kara Marie Calandra Charbonneau wrote a check dated 1/10/2007 and cashed 1/23/2007 to National Insurance for $89,900. Mazi Aff. ¶ 3; Manzi Aff., Ex. C. This check was signed solely by Kara Marie Calandra Charbonneau. Stem also wrote a check dated 7/20/2007 and cashed 8/3/2007 to B. Jones, Inc. for $350. Mazi Aff. ¶ 3; Manzi Aff., Ex. C. This check was signed solely by Stein but is not being challenged as "unauthorized" by Plaintiffs.

15. In August 2007, telephone verification were required only for funds transfer requests exceeding $250,000. Ex. 9, at 168; Ex. 40, Wire Transfers, SB 002151.

16. Signature Bank's policy recommends—but does not require—contacting an individual other than the one who made the request. Ex. 40, SB 002151; Ex. 9, at 189. In this instance, although Stein was contacted, Stein was actually called twice because Ricchezza's callback failed to record properly and Corrado performed a second callback. Ex. 9, at 186–187; Ex. 11, at 223–224. The second callback also failed to record properly. Ex. 9, at 187; Ex. 11, at 223–224.

17. Plaintiffs contend that the account officer is supposed to: (1) personally review the funds transfer and indemnity agreement on file; (2) determine if sufficient funds were available in the account; (3) determine that the signature matched the signature card; (4) ensure that the wire information was generally correct; and (5) ensure that the wire was consistent with the actual and expected activity on the account. Ex. 8, at 255–259, 270–271, 296–298, 311–312, 329–330; Ex. 11, at 78–79. Plaintiffs also contend that Ricchezza did not follow the required procedure, and improperly approved the wire transfer based on the assumptions that the client was making the proper transfer and that someone else had verified the information. Ex. 9, at 182–183, 188–190, 208–209, 212, 231–234.

18. The callback threshold during this time period was $250,000, and no callbacks were performed for any of these transfers. Ex. 9, at 173; Ex. 10, at 102. Ricchezza only verified that the information from the form had been inputted correctly into the system, conduct that Plaintiffs contend did not follow Signature Bank's requirements. Ex. 9, at 208–209, 233–234.

Signature Bank still processed the transactions with the Roslyn address as both the Originator Address and Beneficiary Address. Ex. 41, Wire Transfer Records, CT 000520–21; Ex. 42, Wire Transfer Record, CT 000525–26; Ex. 13, at 132–134.

On September 12, 2007, between the September 6, 2007 and October 23, 2007 wire transfers, the Compliance Department sent out a client questionnaire to obtain more information on $450,000 in outgoing wire transfers. Ex. 8, at 322; Ex. 43, Compliance Client Questionnaire, SB 00445–46. Corrado completed the form after contacting Stein. Ex. 11, at 23–24, 240. Stein informed Corrado that the funds wired were used for investments in the Trust's account at Vibrant Capital. Ex. 11, at 238–239, 243. Corrado accepted Stein's word at face value without any confirmation or investigation.[19] Ex. 11, at 233, 238–240. Corrado indicated the following: "sent to the client's account at Vibrant Capital Corp. for investments. Account is managed by out client Edward T. Stein Associates." Ex. 43, SB 00445. Corrado revised the anticipated account activity to include wire transfers up to $500,000 for investment purposes based upon his conversation with Stein.[20] Ex. 43, SB 00446. Corrado never reviewed the Trust Agreement, contacted the other Trustees, or checked with anyone else at Signature Bank. Ex. 11, at 243–244. No further investigation was made by Corrado or Signature Bank. Ex. 8, at 325–328; Ex. 11, at 243–244.

## C. FRAUD REVEALED

On April 1, 2009, the Trust learned of the fraud when the Securities and Exchange Commission obtained a preliminary injunction and asset freeze against Stein and his entities. Ex. 2, at 63–64; Ex. 7, at 51; Ex. 6, at 54; Ex. 45, SEC Release No. 20983, Apr. 1, 2009.[21] Signature Bank learned of the fraud at the same time as the Trust.[22] Ex. 8, at 274; Ex. 11, at 102; Manzi Aff. ¶ 12.

### *STANDARD OF REVIEW*

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir.2008). The burden of proof rests upon the moving party to show that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "material" fact is one that will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For there to be a "genuine" issue of material fact, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party." *Id.* In determining whether there is a genuine issue of material fact,

---

**19.** Defendant Signature Bank contends that Corrado had no reason to believe otherwise. Ex. 11, at 249–250 (testifying that he lacked any knowledge that Stein was stealing from the Trust).

**20.** Defendant Signature Bank contends that Corrado believed investments were consistent with the Trust's business. Ex. 11, at 238–239, 242–243.

**21.** Stein pled guilty to four counts of securities fraud and one count of wire fraud, and was sentenced to nine years imprisonment. Ex. 46, 6/22/2009 Press Release; Ex. 47, 2/9/2009 Press Release.

**22.** Plaintiffs contend that Signature Bank had actual knowledge of Stein's fraudulent transfers. *See, supra*, discussion of aiding and abetting fraud claim.

the court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

## UCC CLAIMS

### A. N.Y. UCC § 4–A–204 CLAIM

A 4–A–204 claim requires a customer to demonstrate that a receiving bank accepted a payment order issued in its name; and that the payment order was: (i) not authorized and not effective as the order of the customer; or (ii) not enforceable, in whole or in part, against the customer. N.Y. UCC § 4–A–204; *see also Youxin Ma v. Merrill Lynch, Pierce, Fenner & Smith. Inc.,* 597 F.3d 84, 88 (2d Cir.2010); *Regatos v. North Fork Bank.* 5 N.Y.3d 395, 804 N.Y.S.2d 713, 838 N.E.2d 629, 632 (2005). Here, Plaintiffs claim that Defendant Signature Bank (hereinafter, "Defendant Signature") processed payment orders submitted by Stein that were not authorized under the Trust Agreement or principles of agency law and were not effective as transfers by the Trust.

### 1. A Reasonable Jury Could Not Find the Transfers Were "Not Authorized"

■ A payment order is authorized where the receiving bank had actual, implied or apparent authority from the customer to accept the transfer request. *See* N.Y. UCC § 4–A–202 ("A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency."). Here, contracts exist regarding the banking relationship at issue. To the extent that the governing contracts are "found to be wholly unambiguous and to convey a definite meaning" regarding the bank's authority to process payment or-

ders, "the plain meaning of the language chosen by the contracting parties" must be enforced and summary judgment may be appropriate. *Topps Co. v. Cadbury Stani S.A.I.C,* 526 F.3d 63, 68 (2d Cir.2008) (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000)); *Brad H. v. City of New York,* 17 N.Y.3d 180, 183–84, 928 N.Y.S.2d 221, 951 N.E.2d 743 (2011).

■ The Account Application and Funds Transfer Agreement are unambiguous contracts that address Defendant Signature's authorization to process wire transfers. Ambiguity is "a question of law for the court." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 465 (2d Cir.2010). It "exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Id.* at 466 (quoting *International Multifoods Corp. v. Commercial Union Insurance Co.,* 309 F.3d 76, 83 (2d Cir.2002)) (internal quotation marks omitted). The applications contained clear and unambiguous terms. The applications requested information from the Trust that constituted contractual language through clear and unambiguous questions about who can transact business with respect to the Trust funds in the Trust Account. The Trust provided clear written responses identifying the authorized individuals to act on behalf of the Trust.

■ Pursuant to those unambiguous contracts, Defendant Signature was authorized to process the wire transfers at issue. The Account Application designat-

ed Stein as an authorized signer on the Trust Account that could individually transact business. The Funds Transfer Agreement, designated Stein as authorized to engage in wire activity with the Trust funds. There are no provisions that place limitations or conditions on Stein's access to or use of the Trust funds. The record lacks any evidence that the terms of the Account Application and Funds Transfer Agreement were subsequently modified or superseded in a way limiting or preventing the ability to execute the wire transfers at issue. Thus the Trust granted Defendant Signature authority to process the four wire transfers submitted by Stein through the Account Application and Funds Transfer Agreement.

Plaintiffs have failed to articulate a legal basis to reach a different conclusion regarding the terms of the unambiguous contracts. Plaintiffs do not argue that the banking agreements in any way prohibited any of the banking transactions that were executed. Plaintiffs argue that the Trust Agreement did not authorize any of the wire transfers submitted by Stein. None of the provisions in the Trust Agreement address the issue of wire transfers or access to Trust funds held in a bank account. Even assuming that the majority approval requirement in the Trust Agreement could be broadly construed to encompass wire transfers, it would not follow that Defendant Signature's authority to process wire transfers was contingent upon Trustee approval of each wire transfer. The Trust Agreement is silent as to when the approval must occur. Such approval could occur without the knowledge or participation of Defendant Signature. There is no reasonable basis to conclude that Defendant Signature's authority was insufficient simply because the Trust could have used a different, more conservative method to grant that authority, or could have independently prevented such transactions altogether.

Moreover, the Trust Agreement is wholly irrelevant to Defendant Signature's authority. The Trust Agreement governs solely the obligations and authority of Stein and the others as Trustees. The Trust did not incorporate those provisions and require compliance in its contractually based banking relationship with Defendant Signature. Nor did the contractually based banking relationship provide that Defendant Signature was more than a depository bank, or in the capacity as a Trustee or other fiduciary of the Trust Account. The Trust granted Stein unbridled access to Trust funds, and thus it was the Trust—not Defendant Signature—that allowed Stein to treat the Trust Account as his own personal account. Now that the Trust has suffered a substantial loss, the Trust cannot hold Defendant Signature liable for its failures—namely, placing its trust in Stein and/or improperly monitoring Trust funds. *See, e.g., Andre Romanelli, Inc. v. Citibank, N.A.*, 60 A.D.3d 428, 429, 875 N.Y.S.2d 14 (N.Y.App.Div.2009) ("The risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent."). Defendant Signature had no responsibility to enforce the provisions of the Trust Agreement or the contemplated purpose of the Trust, particularly against authorized signers designated by the Trust who exercised the authority given in regard to Trust Funds consistent with the unmonitored power given by the other Trustees.

Plaintiffs also argue that Stein was not acting as an agent of the Trust when he submitted the wire transfers at issue. However, Defendant Signature did not process the wire transfers submitted by Stein because he was a Trustee or because of his actual authority under the Trust Agreement. Rather Defendant Signature did so pursuant to blanket authorization that it received from the Trust. Regard-

less of Stein's abuse of the Trust authority at the time of the wire transfers at issue, the Trust never revoked the power of any authorized signers, and thus never changed Defendant Signature's authority to permit Stein to access the Trust Account. In fact, even if Stein was abusing or acting beyond his authority as a Trustee and agent under the Trust Agreement, the Trust still had an obligation to contact Defendant Signature to remove Stein as an authorized signer.[23]

Accordingly, Defendant Signature is entitled to summary judgment on the 4–A–204 claim. Plaintiffs cannot, as a matter of law, establish that any of the transfers at issue were "not authorized," and, therefore, cannot prove that Defendant Signature violated section 4–A–204.[24]

## B. N.Y. UCC § 4–401 CLAIM

N.Y. UCC § 4–401 makes a bank strictly liable for charging against the customer's account a check with an unauthorized signature. *See* N.Y. UCC § 4–401; *Robinson Motor Xpress, Inc. v. HSBC Bank, USA,* 37 A.D.3d 117, 118–19, 826 N.Y.S.2d 350 (2d Dep't 2006); *Monreal v. Fleet Bank,* 95 N.Y.2d 204, 207, 713 N.Y.S.2d 301, 735 N.E.2d 880 (N.Y.2000); *see also Roberts v. Wachovia Bank, N.A.,* 2010 WL 3629591, at *2, 2010 U.S. Dist. LEXIS 96952, at *6 (S.D.N.Y. Sept. 16, 2010). Here, Plaintiffs claim that Stein's signature on the check cashed by Defendant Signature Bank on 8/16/2007 was unauthorized.

█ A reasonable jury could not find Stein's signature was "unauthorized." An " '[u]nauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." N.Y. UCC § 1–201(43); *Getty Petroleum Corp. v. American Express Travel Related Servs. Co.,* 90 N.Y.2d 322, 327, 660 N.Y.S.2d 689, 683 N.E.2d 311 (N.Y. 1997) (applying section 1–201(43) to 4–401 claim); *Arrow Transp. Sys. v. FleetBoston Fin. Corp.,* 2005 N.Y. Slip Op. 50034U, at *2 (N.Y.Sup.Ct.2005) (same). For substantially the same reasons articulated regarding the 4–A–204 claim, Stein's signature was authorized. Defendant Signature was authorized to cash checks on the Trust Account individually signed by Stein or each of the other Trustees pursuant to the Account Application.[25] It is undisputed that Stein properly signed the 8/16/2007 check. Stein was authorized to withdraw the money by check irrespective of his intent to misappropriate the funds. Thus the 8/16/2007 check contained the proper authorization to be charged against the Trust Account.

Accordingly, Defendant Signature is entitled to summary judgment on the 4–401 claim. Plaintiffs cannot, as a matter of law, establish that the check at issue contained an unauthorized signature, and,

---

**23.** *Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 996 (2d Cir.1991) ("[A]pparent authority terminates when the third person has notice of the termination of the agent's actual authority.") (citations omitted); *Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 624 (2d Cir.1989) ("[A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority.") (citation omitted).

**24.** This Court refrains from addressing whether Plaintiffs can establish that the wire transfers at issue were "not effective," because it is unnecessary to do so.

**25.** It was the Trust and Trustee's responsibility—not that of Defendant Signature—to ensure that the signing authority on the Trust Account was consistent with the Trust Agreement. The evidence indicates, however, that Trustee Kristin Marie Calandra Charbonneau was not only aware of her individual signing authority, but used it without any objection by the Trust.

therefore, cannot prove that Defendant Signature is liable under section 4–401.

## COMMON LAW CLAIMS

 Plaintiffs assert three common law claims: breach of contract, aiding and abetting fraud, and gross negligence. As a preliminary matter, the breach of contract and gross negligence claims are preempted by the New York U.C.C. Article 4–A and Article 4 preclude common law claims that would impose liability inconsistent with the rights and liabilities expressly created by either article. *See Fischer & Mandell LLP v. Citibank, N.A.,* 632 F.3d 793, 798 (2d Cir.N.Y.2011) (Article 4); *Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 100 (2d Cir.1998) (Article 4–A); *accord Ma,* 597 F.3d at 87–88 (same). "Not all common law claims are per se inconsistent with this regime." *Ma,* 597 F.3d at 89. "[T]he critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim." *Id.* at 89–90. Any common law claims about the existence of unauthorized wire transfers or an unauthorized signature on a check, and the mechanics of how those transactions were conducted, fall within the regime of Articles 4–A and 4.[26] This, at a minimum, applies to the breach of contract and gross negligence claims as alleged by Plaintiffs. Nevertheless, this Court will address the merits of each common law claim.

**26.** *See Ma,* 597 F.3d at 90 ("Since all of [plaintiff]'s claims are, at their core, assertions that he did not order or approve any of the disputed electronic transfers of funds from his accounts, we are bound to recognize the rights and duties New York law provides for precisely these circumstance."), 90 (citing as "instructive" *ReAmerica, S.A. v. Wells Fargo Bank International,* 577 F.3d 102, 106–07 (2d Cir.2009) (finding negligence claim

## A. BREACH OF CONTRACT

 "[A] breach of contract claim [under New York law] requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer,* 632 F.3d at 799 (citing *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir. 1998); *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996)). As previously noted, "a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co.,* 526 F.3d at 68 (citations omitted). Here, Plaintiffs claim that: (a) Defendant Signature "agreed to safe[ly] keep the Calandra Trust's funds in accordance with general commercial bank practices" in the Account Application; and (2) Defendant Signature breached that agreement by "failing to employ basic precautionary measures and perform simple investigative steps before or after carrying out the wire transfers for Stein and honoring the check written by Stein." Amended Complaint ¶¶ 24–25.

 The record lacks any evidence that could demonstrate a breach of contract by Defendant Signature. Plaintiffs have notably not identified a single provision in the Account Application or the accompanying terms and conditions of the Business Account Agreement that obligates Defendant Signature to ensure the safety of the Trust funds or otherwise follow general commercial bank practices.[27] In fact,

barred by expired statute of repose for Article 4–A claim addressing same conduct)).

**27.** Plaintiffs' argument that there are material issues of fact as to the terms of the Account Application is unsupported by the record. Plaintiffs contend not that the terms of the Trust Agreement are ambiguous, but that—for various reasons—it is uncertain which terms apply to the Trust. The Trust—via the signa-

based upon this Court's review, no such a provision exists. Plaintiffs cannot, as a matter of law, establish a breach of contract without demonstrating that Defendant Signature violated some right, obligation, or other provision in the written contract.[28] The bank-customer relationship provides for no greater implied responsibilities than those expressly stated in the banking agreements. Accordingly, Defendant Signature is entitled to summary judgment on the breach of contract claim.

## B. AIDING AND ABETTING FRAUD CLAIM

 "To establish liability for aiding and abetting fraud, the plaintiff must show (1) the existence of a fraud; (2)[the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir.2006). "[A]ctual knowledge is required to impose liability on an aider and abettor under New York law." *Id.* (citations omitted); *see also H2O Swimwear* [*, Ltd. v. Lomas*, 164 A.D.2d 804, 560 N.Y.S.2d 19 (N.Y.App.Div. 1990)]; *AA Tube Testing* [*Co. v. Sohne*, 20 A.D.2d 639, 246 N.Y.S.2d 247 (N.Y.App. Div.1964)]. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner*, 459 F.3d at 295 (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157 (N.Y.App.Div.2003)). "However, ... mere inaction ... constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Id.* (same). Here, Plaintiffs claim that Defendant Signature aided and abetted Stein in defrauding the Trust Account.

 The record contains the following evidence: Defendant Signature exclusively interacted with Stein, who it knew to be a Trustee of the Trust and an authorized signer with individual signing authority. Defendant Signature knew that the wire

---

28. To the extent that Plaintiffs are seeking to rely upon failures by Defendant Signature to follow the rules, policies, and procedures set forth in various internal manual, Plaintiffs' claim remains defective. The provisions of the internal manuals were not incorporated into either contract at issue. Moreover, the provisions of the internal manuals were formalized directives to Defendant Signature employees to which the Trust was not privy to access until the present litigation. The internal manuals were not agreed or guaranteed terms of operation between the Trust and Defendant Signature, and thus the Trust has no enforcement rights arising from them. *See, e.g., Lynch v. United States Parole Comm.*, 768 F.2d 491, 497 (2d Cir.1985) (internal procedures manual of an executive agencies); *Lobosco v. New York Tel. Co. NYNEX*, 96 N.Y.2d 312, 317, 727 N.Y.S.2d 383, 751 N.E.2d 462 (N.Y.2001) (employee manuals).

tures of all three Trustees—agreed to all the terms the Business Account Application, as doing so was a necessary condition to opening an account. The fact that Trustees Kristin Hassoun and Kara Marie Calandra Charbonneau signed but may not have reviewed the entire Account Application, including the section indicating individual signing authority, or the accompanying terms is irrelevant. *See AXA Versicherung AG v. New Hampshire Ins. Co.*, 391 Fed.Appx. 25, 30 (2d Cir.2010) ("If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him.") (quoting *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162–63, 170 N.E. 530); *Caloric Stove Corp. v. Chemical Bank & Trust Co.*, 205 F.2d 492, 495 (2d Cir.1953) (noting that "the law of New York in this regard is the same as the general law of contracts: i.e., if a party to a written contract signs it, he is bound by its terms, whatever these may be," even if he has not read it) (citing *Pimpinello*, 253 N.Y. at 160, 170 N.E. 530).

transfers and checks were submitted or signed only by Stein in August 2007 and October 2007. Defendant Signature processed the transactions at issue consistent with the signing authority on file for the Trust. Defendant Signature listed all transactions on monthly statements, and sent those statements to the Trust at the mailing address on file. Defendant Signature knew the names of the recipients, and the fact that the last three wire transfers had the same originator and recipient address. Defendant Signature knew the Trust had identified its business as an insurance trust when it opened the Trust Account, but believed, after communicating with Stein upon the request of the Compliance Department, that the Trust was engaged in investment activity overseen by Stein. Defendant Signature had access to documentation submitted at different times for different purposes that indicates Stem's ownership of the recipients.

 It would be unreasonable for a jury to conclude based on this record that Defendant Signature or any of its employees knowingly and intentionally assisted Stein in defrauding or embezzling money from the Trust Account. Defendant Signature's knowledge at the time of Stein's fraud did not constitute clear evidence of his misappropriation. The record is devoid of any evidence that Defendant Signature monitored the Trust Account and processed its transactions differently than other accounts. The record lacks evidence of any deliberate material failures by Sig-

nature to comply with its required policies and procedures when processing the transactions at issue, or other misbehavior.[29] The record does not even suggest that Defendant Signature suspected Stein's fraud or realized its possibility, and refrained from confirming it in order to be able to later deny knowledge.[30] At best, the record supports an inference that Defendant Signature *might have discovered* Stein's fraud with further investigation by performing the responsibility of the other Trustees to further monitor and question the actions and intentions of an authorized signer Trustee approved by the Trust. That was clearly not the bank's responsibility. Accordingly, Defendant Signature is entitled to summary judgment on the aiding and abetting fraud claim.

## C. GROSS NEGLIGENCE CLAIM

 To establish liability for negligence under New York law, a plaintiff must demonstrate: (1) a duty owed by the Defendant to the Trust, (2) a breach thereof, and (3) injury proximately resulting therefrom. *See Lerner,* 459 F.3d at 286 (quoting *Solomon ex rel. Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985)). A plaintiff can establish gross negligence by, in addition to the elements for negligence, demonstrating that Defendant's conduct "evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *American Telephone and Tele-*

---

**29.** Moreover, it cannot be said that Defendant Signature's conduct—namely, permitting an authorized signer with individual signing authority to initiate the transactions at issue— "proximately caused the harm on which the primary liability is predicated." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,* 446 F.Supp.2d 163, 202 (S.D.N.Y.2006) (citation omitted); *see, e.g., Lerner,* 459 F.3d at 287. What caused the loss to the Trust was Stein's misappropri-

ation of the funds transferred, conduct over which Defendant Signature had no control and, as explained with respect to the gross negligence claim, no duty to investigate.

**30.** *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F.Supp.2d 349, 368 (S.D.N.Y.2007) (applying conscious avoidance in criminal context to aiding and abetting fraud claim).

graph Co. v. City of New York, 83 F.3d 549, 556 (2d Cir.1996) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.S.2d 821, 823–24, 595 N.Y.S.2d 381, 611 N.E.2d 282 (1993)). Here, Plaintiffs claim that Defendant Signature was grossly negligent by breaching its duties to investigate Stein's self-dealing and suspicious behavior and to take reasonable precautions to safeguard the Trust's funds.

 Plaintiffs have failed to satisfy the threshold requirement of demonstrating the existence of a legally recognized duty of care to the Trust. *See Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001). Plaintiffs must establish the existence of a duty owed by Defendant Signature independent of any contractual obligations. The relationship between Defendant Signature and the Trust was governed by a bank customer contract as set forth in the account application. That contract provided that Defendant Signature was a depository bank for the Trust's funds, not a fiduciary, Trustee, or any other party with a legally recognized interest in the administration of the Trust. The Trust, as a consequence, must assert any claims arising from either party's contractual rights and responsibilities under contract—not tort—law.[31]

 Plaintiffs have failed to demonstrate that Defendant Signature owed it a duty to investigate and take additional precautions to protect the Trust's funds independent from the contractually-based banker-depositor relationship. "[A] depositary bank has no [general] duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation." *Lerner*, 459 F.3d at 287 (quoting *Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.*, 280 A.D.2d 653, 654, 721 N.Y.S.2d 94 (N.Y.App.Div.2001)). "The bank has the right to presume that the fiduciary will apply the funds to their proper purposes under the trust." *Id.* (quoting *Bischoff ex rel. Schneider v. Yorkville Bank*, 218 N.Y. 106, 111, 112 N.E. 759 (1916)). A duty to make reasonable inquiry and endeavor to prevent a diversion arises only where a depository bank has "notice or knowledge that a diversion is intended or being executed."[32] *Id.* (quoting *In re Knox*, 64 N.Y.2d 434, 438, 488 N.Y.S.2d 146, 477 N.E.2d 448 (1985)). For the same reasons articulated with respect to the aiding and abetting fraud claim, it would be unreasonable for a jury to con-

---

**31.** *See City of New York v. 611 W. 152nd St.*, 273 A.D.2d 125, 126, 710 N.Y.S.2d 36 (2000) ("[C]laims based on negligent or grossly negligent performance of a contract are not cognizable"); *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 389–390, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract..... Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim"); *Luxonomy*

*Cars. Inc. v. Citibank, N.A.*, 65 A.D.2d 549, 550, 408 N.Y.S.2d 951 (N.Y.App.Div.1978) ("Abstractly, a tort may accompany a breach of contract, but only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is also violated.") (citing *Rich v. New York Cent. & Hudson Riv. R.R. Co.*, 87 N.Y. 382 (1882)); *see, e.g., Stella Flour & Feed Corp. v. National City Bank*, 285 A.D. 182, 186, 136 N.Y.S.2d 139 (N.Y.App. Div.1954) (banking context).

**32.** "Adequate notice" means "circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly." *Lerner.* 459 F.3d at 287.

clude based on this record that Defendant Signature had notice or knowledge of Stein's fraud. Absent such a finding Defendant Signature could not have been obligated by a duty of inquiry to the Trust. Plaintiffs have thus failed to identify an independent duty, and, as a consequence, cannot prove their negligence claim. Accordingly, Defendant Signature is entitled to summary judgment.

## CONCLUSION

Defendant Signature Bank's motion for summary judgment is GRANTED.

Plaintiffs' motion for partial summary judgment is DENIED.[33] Plaintiffs' motion to strike Defendant's motion for summary is DENIED as moot.

Plaintiffs' claims against Defendant Signature Bank are DISMISSED.

SO ORDERED.

---

**33.** Plaintiffs moved for partial summary judgment favor on the gross negligence and UCC claims on the ground that, Defendant Signature accepted, opened, and set up an account on behalf of the Trust without employing or following any commercially reasonable policies and procedures to protect the Trust's funds. Plaintiffs argue that there is no dispute that contrary to its own "binding" policies and procedures, Defendant Signature failed to set up the Trust Account in accordance with the Trust Agreement; failed to train its employees on how to handle trust accounts; failed to monitor the account to ensure that transactions were consistent with the purpose of the Trust; assumed that the fraudulent transactions were valid rather than employ reasonable security measures; and ignored the obvious self-dealing of a Trustee who was transferring Trust funds to accounts that Defendant Signature knew were under his control. Plaintiffs also argue that, even after Defendant Signature identified transactions that were inconsistent with the account, Defendant Signature admitted that it contracted only the Trustee who was engaged in the fraudulent self-dealing, accepting his explanation for his interested transactions without any investigation or confirmation.